**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

AL RUSHAID PETROLEUM
INVESTMENT COMPANY and AL
RUSHAID TRADING COMPANY,

                       Plaintiffs,

vs.

SIEMENS ENERGY, INC.,

                       Defendant.

**COMPLAINT**

**Case No.**

Plaintiffs Al Rushaid Petroleum Investment Company ("ARPIC") and Al Rushaid Trading Company ("ARTC" and, together with ARPIC, "Al Rushaid"), as and for their Complaint against Defendant Siemens Energy, Inc. ('Siemens Energy"), allege as follows:

## INTRODUCTION

1.      For more than forty years, Al Rushaid has played an important role in the development of Saudi Arabia's oil and gas industry and aided foreign manufacturers of oilfield equipment in gaining access to the lucrative Saudi market. Al Rushaid's value to foreign companies is exemplified by the success that it achieved in Saudi Arabia for Dresser Rand Group ("DRG").

2.      Pursuant to exclusive sales representation agreements between ARTC and DRG, Al Rushaid introduced DRG's turbines, compressors, and other reciprocating products to the Middle East and developed widespread recognition of the DRG brand. It also helped DRG secure a long-term contract with Saudi's most coveted and influential customer, the Saudi Arabian Oil Company ("Saudi Aramco"), that promised to yield hundreds of millions in equipment sales and even more in ongoing service and maintenance revenues. In fact, because Al Rushaid was such an integral part of

the deal and trusted business partner of Saudi Aramco, Saudi Aramco insisted that the contract be fulfilled by a joint venture (the "Joint Venture") owned and operated by affiliates of DRG *and* ARTC – namely, Dresser-Rand Holdings (Netherlands) B.V. ("DRH") and ARPIC.

3.    Yet, by the time Siemens Energy acquired DRG and its affiliates in 2015 for $6.4 billion, ARPIC and ARTC had already enabled DRG, through the Joint Venture, to establish a profitable, long-term contractual relationship with Saudi Aramco. Moreover, the extraordinary expenses associated with the Joint Venture's construction of a $55 million, state-of-the-art facility and other start-up obligations had already been incurred; the long-awaited and substantial profits from the sale of equipment, service, and maintenance were about to be realized; Saudi law no longer required ownership by a Saudi-based partner; Siemens had a long-standing, exclusive relationship with another prominent Saudi agent that was well-positioned to effectuate sales in place of ARTC; and the confidential and proprietary information of ARPIC critical to the success of the Joint Venture had already been disclosed. Thus, by Siemens Energy's own admission, ARPIC and ARTC became expendable.

4.    Siemens Energy therefore engaged in a deliberate scheme to interfere with the clear contractual rights of ARPIC and ARTC and retain for itself the benefits of the business relationships and opportunities forged by ARPIC and ARTC.

5.    First and foremost, Siemens Energy secretly transitioned the Joint Venture's operations to Siemen's own nearby facility, and has been using the Joint Venture, its product line, its personnel, and ARPIC's confidential and proprietary information to not only fulfill the Joint Venture's existing contract with Saudi Aramco but also secure for itself other extremely lucrative contracts and opportunities with Saudi Aramco that undoubtedly belong to the Joint Venture. For example, and without limitation, in July 2020, Siemens Energy was selected to provide compressor systems for Saudi Aramco's Hawiyah Unayzah Gas Reservoir Storage project; in February 2021, Siemens Energy was

selected to supply more than 20 high-efficiency compressor trains for Saudi Aramco's Tanajib Plant facilities; and, in March 2021, Siemens Energy and Saudi Aramco signed a 15-year service agreement pursuant to which Siemens Energy will provide, service, and maintain a range of turbines and generators for Saudi Aramco's four largest oil fields. In fact, the Saudi Aramco business that Siemens Energy has diverted from the Joint Venture has become so expansive and profitable that Siemens Energy recently completed a massive expansion of the Siemens Facility so that it could better service Saudi Aramco. Meanwhile, the Joint Venture has yet to secure or fulfill a single purchase order or contract for Saudi Aramco.

6.      In addition to hijacking corporate opportunities, Siemens Energy has purposely excluded ARPIC from the Joint Venture; given Joint Venture partners the false and purposely misleading pretense that ARPIC remains actively involved in the Joint Venture operations, thereby misappropriating ARPIC's goodwill and jeopardizing its reputation; has caused DRH to breach the agreements governing the Joint Venture by, among other acts and omissions, failing to provide periodic accountings and financial statements, failing to distribute to ARPIC a share of the Joint Venture's profits proportionate to ARPIC's ongoing 49.9% ownership interest, and engaging in business that competes directly with the Joint Venture; and caused DRG and its affiliates to purportedly terminate its sales representation agreements with ARTC without satisfying the many millions owed thereunder and inducing ARTC to forego collection of the outstanding commissions by promising they would be addressed.

7.      The purpose of this action is to hold Siemens Energy accountable for these unlawful acts by imposing appropriate monetary and reputational damages resulting therefrom.

## JURISDICTION and VENUE

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  ARPIC and ARTC are citizens of the Kingdom of Saudi Arabia and Siemens Energy is a citizen of Delaware.

9.      Personal jurisdiction is proper over Siemens Energy because, among other factors, (i) Siemens Energy is headquartered in Orlando, Florida, (ii) Siemens Energy is registered to do business in Florida, and (iii) Siemens Energy's contacts and affiliations with Florida are so continuous and systematic as to render it essentially at home in Florida.

10.      Venue is proper in this District under 28 U.S.C. § 1291(b)(2) and (3) because, among other reasons, (i) Siemens Energy maintains its principal place of business in Orlando, Florida, (ii) Siemens Energy is registered to do business in Florida, and (iii) a substantial part of the conduct and events giving rise to this action occurred in and/or originated from Orlando, Florida.

## PARTIES

11.      ARPIC is a company organized under the laws of the Kingdom of Saudi Arabia with Commercial Registration Number 2051007604 and its registered address at P.O. Box 31685, Al Khobar 31952, Saudi Arabia.

12.      ARTC is a company organized under the laws of the Kingdom of Saudi Arabia with Commercial Registration Number 2051006882 and its registered address at P.O. Box 31685, Al Khobar 31952, Saudi Arabia.

13.      Siemens Energy is a Delaware corporation.  Siemens Energy is headquartered in Orlando, Florida (https://www.siemens-energy.com/us/en.html), with its principal place of business located at 4400 Alafaya Trail, Orlando, Florida.  Siemens Energy is also registered to do business in Florida.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

14.     Prior to mid-2016, companies from outside the Middle East seeking to do business in Saudi Arabia faced significant challenges.  For instance, only companies from Saudi Arabia, Kuwait, Qatar, Oman, Bahrain, and the United Arab Emirates were permitted to engage in trading and retail activities without a local Saudi partner.  Thus, partnering with a Saudi-based entity was legally, politically, and practically essential for foreign companies wishing to sell or distribute their products to Saudi customers, or to manufacture and/or service products in Saudi Arabia.

15.     Since its inception in 1978, Al Rushaid has acted as the Saudi partner for innovative companies from around the world seeking to respond to the development needs of Saudi Arabia and penetrate the Saudi market.  ARTC, in particular, has played a prominent role in the Saudi economic landscape, helping foreign companies establish contacts in Saudi's oil and gas industry and achieve significant sales of their products and services in the Saudi marketplace.

**A.     Al Rushaid Establishes DRG's Presence in Saudi Arabia.**

16.     More than thirty years ago, executives of DRG, then a relatively modest-sized manufacturer of certain turbines and compressors for the oil and gas industry with limited reach beyond the United States, formed a business relationship and friendship with Al Rushaid's former Chairman and CEO, Sheikh Abdullah Al Rushaid, and engaged ARTC to introduce and develop DRG's brand in Saudi Arabia, with a particular focus on Saudi Aramco.  With over 76,000 employees and annual revenues of over $300 billion, Saudi Aramco effectively controls the Saudi oil and gas market and is one of the largest grossing companies in the world.

17.     In January 1994, DRIBV and ARTC entered a sales representation agreement (the "SRA"), pursuant to which ARTC became the exclusive agent for the sale of certain DRG products in Saudi Arabia.[1]

18.     Among other relevant provisions, the SRA: (i) granted to ARTC "the exclusive right to solicit orders for the 'Products' within the 'Territory', which shall consist of: Kingdom of Saudi Arabia"; (ii) defined the "Products" to include small gas turbines, large gas turbines, and compressors, as well as spare parts purchased along with the foregoing items (collectively, "Gas Turbines"); and (iii) entitled ARTC to commissions of 2.5% of the net sales price of all "Products" and spare parts purchased with each "Complete Unit."

19.     Consistent with DRG's long-term belief that spare parts, service, and maintenance would be a source of strong, recurring revenues, DRIBV and ARTC also entered into an Aftermarket Sales Representation Agreement (the "ASRA"). The ASRA granted ARTC the exclusive right to solicit orders in Saudi Arabia for the "field service, repairs and spare parts" related to the same Products encompassed by the SRA (namely, Gas Turbines), and assigned to ARTC a ten percent (10%) commission for all such sales.

20.     The SRA and the ASRA contained the same general provisions.

21.     Under the SRA and the ASRA, ARTC faithfully and successfully served as DRG's sales agent, effectuating large-scale sales of DRG products, introducing DRG to strategic partners in the region and building a substantial presence for DRG in the Saudi market.

22.     For instance, from 2005 to 2009 alone, ARTC generated tens of millions in sales for DRG and earned substantial commissions as a result of those sales.

---

[1] Upon information and belief, DRIBV later assigned its rights and obligations under the SRA to DRIS. DRIS was then merged into DRG, which assumed DRIS's rights and obligations under the SRA.

23.    As of early 2009, DRG owed ARTC millions in commissions pursuant to the SRA and the ASRA (the "Pre-JV Commissions").

**B.    Al Rushaid Secures an Award to DRG of a Lucrative Corporate Procurement Agreement with Saudi Aramco.**

24.    By virtue of Al Rushaid's reputation in the Saudi oil and gas arena, as well as the tireless efforts of ARTC to build DRG's brand in the region, DRG was awarded the opportunity to do business with Saudi Aramco in or about March 2009.

25.    Under the Corporate Procurement Agreement (the "CPA"), DRG was required to enter into the Joint Venture with an entity operating under Al Rushaid's umbrella and manufacture, service, and repair large single-stage steam turbines ("SSTs"), compressors, and related equipment for Saudi Aramco's oil and gas projects (collectively, "Steam Turbines").

26.    As Vince Volpe, DRG's former President and CEO emphasized, the CPA was a big step for DRG in solidifying its position in the Middle East markets and its relationship with Saudi Aramco:

> Part of our strategic plan clearly identified the need for a strong unified approach to our Middle East markets, including the opportunity to better service our clients with more local presence. The agreement with Saudi Aramco, one of the world's largest oil producers, is a leap forward for us. We have worked closely with Saudi Aramco to better understand their requirements, and after extensive review, we are honored to have been selected as the first manufacturer to supply our full range of compressor and steam turbine products under the Corporate Procurement Agreement.

27.    The CPA also promised to be lucrative. According to DRG's financial forecasts, the revenues for the sale of the equipment alone were anticipated to exceed $140 million, and the revenues for the maintenance and repairs were expected to be much greater.

28.    It was understood that the early years of the Joint Venture would be laden with heavy expenses associated with the construction of a facility and infrastructure and ramping up the operation. DRG was well aware that the true value of the CPA and other contracts was the long-term, recurring

revenue that the Joint Venture would eventually earn from the aftermarket sale of spare parts, repairs, and maintenance to Saudi Aramco and other customers.

29.    Indeed, as DRG later underscored in its 10-K Financial Statements, it was the aftermarket parts and service that promised to provide "long-term growth opportunities":

> We continue to believe that the aftermarket parts and services segment provides us with long-term growth opportunities. Aftermarket parts and services are generally less sensitive to business cycles than the new units segment, although revenues and bookings tend to be higher in the second half of the year. **With a typical operating life of 30 years or more, rotating equipment requires substantial aftermarket parts and services over its operating life. Parts and services activities realize higher margins than new unit sales**. Additionally, the cumulative revenues from these aftermarket activities often exceed the initial purchase price of the unit. Our aftermarket parts and services business offers a range of services designed to enable clients to maximize their return on assets by optimizing the performance of their mission-critical rotating equipment. . . .

> We believe we have the largest installed base of the classes of equipment we manufacture and the largest associated aftermarket parts and services business in the industry. Many of the units we manufacture are unique and highly engineered, and servicing these units requires knowledge of their design and performance characteristics. We estimate that we currently provide approximately 57% of the supplier-provided aftermarket parts and services needs of our own manufactured turbo products, reciprocating compressors and steam turbines and less than 5% of the supplier provided aftermarket parts and services needs of these same classes of equipment of other manufacturers. We focus on a global offering of technologically advanced aftermarket products and services, and as a result, our aftermarket activities tend to be concentrated on the provision of higher value-added parts and upgrades and the delivery of sophisticated operating, repair and overhaul services. Small independent companies tend to focus on local markets and have a more basic aftermarket offering.

> A significant portion of our installed base is serviced in-house by our clients. However, we believe there is an increasing trend for clients to outsource this activity, driven by declining in-house expertise, cost efficiency and the superior service levels and operating performance offered by OEM service providers. We believe the steady demand for aftermarket parts and services from our installed base represents a stable source of recurring revenues and cash flow. Moreover, with our value-based solutions strategy, we have a demonstrated track record of

growth in this segment as a result of our focus on expanding our service offerings into new areas, including servicing other OEMs' installed base of equipment, developing new technology upgrades, increasing our penetration of higher value-added services to our own installed base and extending our served markets through acquisitions in contiguous markets such as gas and diesel engine repair, gas turbine repair, steam turbine trip and throttle valves, foundation repair and emission control technologies for integral gas engines.

Because equipment in our industry typically has a multi-decade operating life, we believe aftermarket parts and services capability is a key element in both new unit purchasing decisions and sales of service contracts.

(Emphasis added).

### 1.    Conditions of the Corporate Procurement Agreement.

30.    Saudi Aramco awarded the CPA to DRG subject to two critical conditions.

31.    *First,* because of the trust and rapport that Al Rushaid had developed with Saudi officials and Saudi Aramco, the CPA required that DRG form a joint venture with an entity within the Al Rushaid Group as its local partner under the name of "Dresser Arabia, LLC" to fulfill the purchase orders for the production service, and maintenance of certain products, including Steam Turbines.

32.    *Second*, the CPA required that the Joint Venture construct a facility in Saudi Arabia to fulfill the purchase orders, as well as develop employment opportunities and other local content.

33.    These requirements were memorialized in the Local Content Accord to the CPA. For example:

(a)    The "Statement of Commitment" in the Local Content Accord expressly documented DRG's commitment to the formation of the Joint Venture and construction of a new facility to fulfill the purchase orders:

> Dresser-Rand commits to open Dresser-Rand Arabia LLC in the Kingdom. The activities that will be performed in this facility are described in detail in the CPA [L]ocal Content Accord.

(b)     The Local Content Accord also specified the size and timeline for completion of the new facility to be constructed by the Joint Venture.

(c)     The Local Content Accord defined the "Scope of Local Operations" to be performed by the Joint Venture to include, *inter alia*: (i) "[t]he manufacturing of Dresser-Rand general purpose [S]team [T]urbines"; (ii) "[t]he packaging of Dresser-Rand centrifugal and reciprocating compressors, including drivers such as motors and turbines"; (iii) "[t]he repairing, revamping and upgrading of Dresser-Rand name plate (namely, [S]team [T]urbines, turbo-compressors, reciprocating compressors, [G]as [T]urbines . . . , valves, gas seals) as well as non-name plate compressors (including internally geared compressors), electronic motors, generators, and steam, power and gas turbines"; and (iv) "[t]he provision of technical support services in relation to [Steam and Gas] [T]urbines, compressors, motors, and generators, including installation, systems integration, maintenance, project management, condition monitoring, parts inventory management, and training."

(d)     And, the Local Content Accord required the Joint Venture to maximize the employment of Saudi-based engineers and other workers and to hire existing Saud Aramco employees.

34.     The CPA also underscored the substantial focus placed on service, repair, and maintenance.  The Local Content Accord expressly acknowledges that DRG agreed to form the Joint Venture and build a new facility "in consideration of Saudi Aramco's intention to outsource repairs for rotating equipment."

35.     The CPA also included a General Services Agreement, pursuant to which DRG agreed to "furnish all facilities, machine tools, hand tools and equipment for the Transportation, Inspection, Overhaul, Repair, Exchange, Materials and Spare Parts Inventory Management, Life Cycle Advantage Surveys/Field Programs and Training for various types of [DRG] and other Equipment including Centrifugal Compressors, Steam Turbines, Gas Seals, Pumps and Parallel Shaft Gearboxes" via the Joint Venture.

**2.** **ARPIC and a DRG Affiliate Enter into Business Venture Agreement Creating a Co-Owned Joint Venture to Profit from the CPA with Saudi Aramco and Engage in Producing and Servicing Oilfield Equipment.**

36.    Because the CPA was conditioned on the formation of a joint venture with an Al Rushaid entity and Saudi law then required joint ventures to have a Saudi-based partner, DRG asked ARPIC to become its partner in the Joint Venture.

37.    To induce ARPIC to enter the Joint Venture, DRG assured ARPIC that the Joint Venture would be profitable for both parties.  In particular, it represented to ARPIC that, though the construction of a new facility may consume most of the revenues in the early years, locally manufacturing equipment critical to the production of oil and gas would give the Joint Venture a stronghold in the Saudi market, and the revenue that would be derived from the service and maintenance of equipment owned by Saudi Aramco and other customers would be substantial, recession-proof, and long-lasting.

38.    DRG also convinced Al Rushaid to forego ARTC's collection of the Pre-JV Commissions based on promises that the profit distributions ARPIC would receive through the Joint Venture would easily eclipse the monies that were then due and owing to ARTC.

39.    On or about March 18, 2009, ARPIC and a DRG affiliate, DRH, entered a Business Venture Agreement (the "BVA") for the purpose of governing the Joint Venture created to fulfill the requirements of the CPA and to complete the purchase orders for equipment, service, and maintenance issued thereunder.

40.    The importance of ARPIC's participation and its familiarity with the Saudi laws, rules, practices, and business customs was underscored in the "Statement of Intent" to the BVA:

> ARPIC is engaged in business in the Kingdom of Saudi Arabia and has knowledge of the laws, regulations, customs and practices essential to successful business ventures in such jurisdiction.

41.     The minutes of DRG's Board of Directors meeting held in January 2009 in anticipation of the CPA similarly made clear that DRG considered ARPIC a trusted partner with strong ties to Saudi Aramco and critical to the success of the Joint Venture:

> At Mr. Macaulay's invitation, Mr. Volpe provided an overview of his visit with management of Saudi Aramco in December and the Company's interest in signing a Corporate Procurement Agreement with Saudi Aramco. He explained that Saudi Aramco was interested in working with Dresser-Rand and facilitating its interest to develop a local presence in Saudi Arabia. He noted that enhancing the Company's presence in the Kingdom and region was consistent with the strategy that had been supported by the Board to focus on geographic penetration. He commented upon the strong opportunities with Saudi Aramco and that the proposed facility would serve other clients both within and outside the Kingdom.

> Mr. Volpe explained that management was proposing to enter into a joint venture with the Al Rushaid Petroleum Investment Company ("ARPIC"). The Company has been involved with Sheik Abdullah Al-Rushaid for over 25 years by virtue of his affiliate serving as a sales representative of the Company. Mr. Volpe explained the benefits of working with ARPIC and the key governance mechanisms that would be put in place.

> * * * * *

> Mr. Macaulay noted that companies he had been associated with had done business with Sheik Al-Rushaid for years and that Sheik Al-Rushaid was well regarded by them.

42.     In fact, as recently as 2017, DRG conceded that it believed that, by affiliating with ARPIC, it would gain credibility with Saudi Aramco and other potential customers and facilitate compliance with local Saudi requirements.

**3.      The Joint Venture's Scope of Business and the BVA's Non-Competition Provisions.**

43.     Pursuant to the BVA, it was agreed that the Joint Venture would fulfill all purchase orders issued to DRG by Saudi Aramco that fell within the "business" of the Joint Venture. The "business" was defined to include the same equipment and services as the "Scope of Local Operations" set forth in the CPA (collectively, the "Scope of Business"), namely:

    a.      manufacturing SSTs;

    b.      packaging centrifugal and reciprocating compressors, including drivers such as motors and turbines;

    c.      repairing, revamping and upgrading DR brand and non-DR brand equipment; and

    d.      providing technical support services in relation to turbines, compressors, motors, and generators.

44.    At the same time, the BVA restricts the parties' right to compete with the Joint Venture by, *inter alia*, (i) generally prohibiting direct competition within the Scope of Business when occurring in the Scope of Local Operations, and (ii) imposing disclosure and notice requirements that are triggered when any party to the BVA intends to engage in business activities in the Scope of Local Operations from which the Joint Venture could benefit or that is arguably competitive with the Joint Venture.

45.    It also imposes affirmative obligations on the owners of the Joint Venture to, in certain circumstances, prioritize the Joint Venture's business opportunities over their other business ventures in Saudi Arabia.  For instance, the BVA requires the parties to "facilitate the Company's ability to purchase, service, and support orders within the Scope of Business."

**4.    The BVA and the SRA Are Amended to Confirm and Enhance the Rights of ARPIC and ARTC.**

46.    In April 2013, DRH and ARPIC entered an Amendment to the BVA (the "BVA Amendment") and DRG and ARTC entered an Addendum to the SRA (the "SRA Addendum") confirming and enhancing the rights of ARPIC and ARTC.

(a)    The BVA Amendment expressly acknowledged that there were commissions owed to ARTC and that ARPIC would receive a credit for those commissions against ARPIC's capital contribution obligations to the Joint Venture.

(b)     The BVA Amendment provided for the termination of an existing sales representation agreement with Binzagr Company ("Binzagr"), pursuant to which Binzagr was appointed as the exclusive sales agent for all equipment manufactured by Dresser Arabia, so that ARTC could replace Binzagr as Dresser Arabia's exclusive agent pursuant to the SRA Addendum.

(c)     The SRA Addendum amended the SRA to include the SSTs and compressors manufactured by Dresser Arabia in the "Products" that ARTC was authorized to sell.

(d)     The SRA Addendum increased ARTC's commissions rate for the sale of all "Complete Units" to two percent (2%) of the net sales price.

(e)     The SRA Addendum confirmed that ARTC was owed commissions for previous sales to the Saudi Aramco Total Refining and Petroleum Company.

(f)     The SRA Addendum expressly acknowledged that, in addition to commissions earned by ARTC, ARPIC would "continue to participate in the distributed profits of [Dresser Arabia] in proportion to its ownership interests, which may include profit from sales by [Dresser Arabia] of steam turbines and aftermarket services for gas turbines."

**5.      The Joint Venture Constructs a State-of-the-Art Facility in Saudi Arabia and Positions Itself to Dominate the Local Market.**

47.     From 2009 to 2013, the Joint Venture leased two separate facilities in Saudi Arabia – first in Jubail and then at Cleveland Bridge – to fulfill purchase orders issued pursuant to the CPA and for other projects while plans for the construction of a new facility were being discussed and finalized.

48.     Despite ARPIC's vehement objections to the new facility proposed by DRH – including that the projected costs were exorbitant, that it would be more cost effective to refurbish the leased facility at Cleveland Bridge, and that the contractor engaged to construct the new facility was overpriced – DRH insisted on pressing forward with the construction of a new facility in the Dammam Second Industrial City (the "JV Facility").

49.    The JV Facility was completed in 2013 at a total cost of approximately $55 million and became operational in 2014.

50.    The JV Facility is state-of-the-art and utilizes technology unparalleled in the Middle East.

51.    For example, the JV Facility has the unique capability to: (i) package compressors with the ability to lift packages weighing up to 120 tons, which would, in turn, enhance the capabilities and efficiencies of the oilfield applications of Saudi Aramco and other producers of oil and gas in the region; and (ii) not only manufacture the SSTs, but also test run them in the JV Facility after manufacture or repair.

52.    The JV Facility is also equipped with CNC ("computer numerical code")-controlled tools that allow for the efficient production of custom-designed parts tailored for the needs of the Saudi market.

53.    Finally, the JV Facility houses the only vacuum high-speed balance machine in the region, thereby providing Middle East clients with the convenience and expediency of having their critical rotors serviced in Saudi Arabia as opposed to the delay and cost of shipping them to Europe or the United States.

54.    Because the JV Facility had the capacity to mass manufacture, service, and repair equipment essential to meeting the increasing needs of Saudi Arabia's oil and gas industry, the Joint Venture was poised to dominate the market and become one of the largest, if not the largest, suppliers and servicers of turbines, compressors, and reciprocating equipment to Saudi Aramco and other customers in the Middle East.

55.    In fact, the completion of the JV Facility coincided with a significant ramp up of intensity in oil drilling in Saudi Arabia.  As of 2014, Saudi Aramco was investing heavily in new wells and new production infrastructure, both for existing fields and to bring new fields onstream.

56.     The JV Facility was particularly significant for DRG because it was DRG's only physical plant in the Middle East and gave it significant logistical advantages over its competitors with operations confined to the United States and Europe.

57.     The Joint Venture also had significant business advantages over its competitors because of ARPIC's participation. For example, ARPIC disclosed to DRG confidential and proprietary information that ARPIC was diligent in protecting and shared only with trusted business partners, and were critical to the success of the Joint Venture, including, but not limited to, customer lists and contacts, pricing formulas, bidding strategies, and market analyses and forecasts.

58.     By virtue this and other confidential and proprietary information developed by and belonging exclusively to ARPIC, the Joint Venture was armed to navigate and excel in Saudi Arabia's highly restrictive oil and gas market, including the politics, intricacies, and complexities of maintaining and growing a relationship with Saudi Aramco.

6.      **After Acquiring DRG and its Subsidiaries, Siemens Energy Causes Them to Breach the BVA and SRA, Divert Revenues and Business Opportunities from the Joint Venture, and Misappropriate ARPIC's and ARTC's Good Will, Proprietary Information, Trade Secrets, and Valuable Relationships in Saudi Arabia.**

59.     Despite its size, diversity, and worldwide reach, Siemens had no meaningful presence or production in the oil and gas industry through at least 2010. Though it had long been a leading manufacturer of gas turbines and compressors, that equipment was limited to power generation for building-based industrial applications and processes, as well as for rail, air, and water transportation.

60.     Siemens had formed a partnership with Juffali, a prominent, Saudi-based commercial agent, as early as the 1960s. But, as of 2010, Siemens did not have the engineering, product line, ability, or capacity to fulfill the field-based needs of Saudi Aramco and other producers of oil and gas in the Middle East. Upon information and belief, Siemens also lacked the reputation, contacts, know-how, relationships, insight, and strategies to penetrate that market.

61.     Commencing in or about 2010, Siemens began to implement its plan to enhance its local presence in Saudi Arabia and become a pivotal player in the oil and gas industry.

62.     In or about 2011, Siemens, together with Saudi Aramco and Saudi Electricity Company, jointly committed to build turbine manufacturing facilities in the Dammam Industrial District known as the "Siemens Dammam Energy Hub" (the "Siemens Facility").

63.     The Siemens Facility provided Siemens with a physical presence in the region.

64.     In 2014, Siemens announced that it had reached an agreement whereby Siemens Energy would acquire DRG by way of a friendly takeover and purchase of its stock.

65.     According to statements issued by Siemens, DRG was an attractive acquisition by Siemens Energy for three fundamental reasons.

66.     First and foremost, the acquisition would expand Siemens' product line to include large steam and gas turbines, compressors, and other reciprocating equipment, and, in turn, greatly improve Siemens' position in the oil and gas market.

67.     For example, in a power point presentation dated September 2014 and entitled "Executing Vision 2020 – Acquisition of Dresser Rand," Siemens boasted about DRG's "well balanced & strong portfolio" in oil and gas.

68.     More specifically, Siemens emphasized that: (i) DRG was responsible for the lion's share of all installed turbines and compressors in the oil and gas industry; (ii) DRG's portfolio consisted of important products – including reciprocating compressors, high-speed engines, small gas turbines, axial expanders, and micro LNG – that were not part of Siemens' existing portfolio; and (iii) even where there was some overlap, such as with compressors and steam turbines, the focus of the companies' respective products was very different – DRG's products focused on oil and gas whereas Siemens' products focused on industrial applications.

69.     Thus, as Siemens put it: "Together, Dresser-Rand and Siemens [would] offer a highly attractive portfolio for oil & gas customers."  And, the combination of their distinct product lines, according to Siemens' projections, allowed for annual growth in the industry at a rate of six to eight percent (6% to 8%).

70.     As Siemens boasts on its website, Siemens Energy now collectively "offers a comprehensive portfolio of turbo and reciprocating compression solutions for the Oil and Gas Industry and other process industries," which includes products that were exclusive to Dresser-Rand and/or the Joint Venture prior to the acquisition.  For example, the Siemens Energy website states:

> Gas Turbines for Oil and Gas Applications
>
> For power generation in upstream, midstream and downstream applications as well as mechanical drives for compressors and pumps, Siemens gas turbines are proven and trusted in the industry.  They ensure outstanding reliability for oil and gas production and processing as well as pipeline, LNG and refinery applications.
>
> Axial Compressors
>
> The ideal match for high volume air compression as required in large air separation units or for catalyst regeneration in selected petrochemical and refining processes.
>
> Reciprocating Compressors
>
> Our line of reciprocating compressors has an outstanding record for performance, efficiency, reliability, and low maintenance in the most demanding upstream, midstream, and downstream applications.

71.     The Joint Venture, in particular, was attractive to Siemens because Saudi Aramco was investing heavily in an expansion of its operations and the combination of the Joint Venture's unique ability to manufacture and service field equipment, its long-term, lucrative relationship with Saudi Aramco, and the proprietary information and trade secrets shared by ARPIC, would provide Siemens with a "turn key," low-risk entry into and ability to grow in the Saudi oil and gas market.

72. The acquisition via Siemens Energy also allowed Siemens to reap the long-term benefits of DRG's service and repair revenues. As Siemens touted in its PowerPoint presentation, DRG's "service revenue streams via large installed bases" – which then accounted for fifty percent (50%) of DRG's total revenues – would provide Siemens with "[s]olid double digit profit margins" "from day one."

### a.    ARPIC and ARTC Become Expendable.

73. By the time the acquisition was completed in mid-2015, ARTC became expendable to Siemens and DRG because Siemens already had a long-standing sales agency relationship with Juffali, which could fill ARTC's role in effectuating the sale of DRG products in Saudi Arabia and other parts of the Middle East. Siemens and Juffali had been working together for more than fifteen years. In addition, ARPIC had already divulged its confidential intelligence and strategy for navigating and breaking new ground in the complex Saudi market and fostering and furthering the relationship with Saudi Aramco.

74. Likewise, ARPIC's participation in the Joint Venture was no longer necessary or desirable because (i) the Joint Venture had already endured the expense-laden start-up period associated with the construction of the JV Facility and was about to earn the long-awaited profits yielded by the service, repair, and maintenance, and (ii) Saudi law no longer required the participation of a Saudi-based partner in a joint venture.

### b.    Siemens Energy Intentionally Interferes with ARPIC.

75. Siemens Energy therefore launched a strategic, multi-faceted campaign to acquire for themselves the benefits from the existing contractual rights and prospective business relationships of ARPIC and ARTC.

76. *First*, without informing ARPIC or obtaining its consent, Siemens Energy secretly abandoned the JV Facility and transitioned all of the Joint Venture's operations to the Siemens Facility,

where it has been exploiting the Joint Venture's rights, its product line, and its personnel, as well as ARPIC's proprietary information and trade secrets, to fulfill and keep for themselves the benefits of the tens of millions of dollars earned from purchase orders issued by Saudi Aramco under the CPA and subject to the BVA.

77.     *Second*, upon information and belief, Siemens Energy has been using the Joint Venture, its product line, and its personnel, as well as ARPIC's proprietary information and trade secrets, to fulfill and keep for themselves the benefits of other existing contracts of the Joint Venture that have been concealed from ARPIC.

78.     *Third*, Siemens Energy has purposely excluded ARPIC from all aspects of the Joint Venture and denied ARPIC its clear contractual rights under the BVA and BVA Amendment.  Since the acquisition, Siemens Energy has failed to provide ARPIC with any of the required reports and financial statements accounting for the substantial monies being earned by Dresser Arabia pursuant to its existing contractual relationship with Saudi Aramco and other customers, much less issue to ARPIC a distribution of the Joint Venture's profits proportionate to ARPIC's ongoing ownership interest.

79.     *Fourth*, upon information and belief, Siemens Energy has secured and fulfilled and/or is fulfilling contracts it was not in a position to secure or fulfill prior to hijacking the Joint Venture and that would have been awarded to and fulfilled by the Joint Venture to the benefit of ARPIC and DRH.  By way of example only:

•      At or about the same time that Siemens Energy agreed to purchase DRG in 2014, Siemens Energy received an order valued at nearly $600 million to supply certain gas and steam turbines for the Rabigh 2 IPP combined-cycle power plant in Saudi Arabia – an order that neither Siemens nor Siemens Energy had the capability to fulfill until Siemens Energy seized control of the operations of the Joint Venture.

- In or about 2017, Siemens was awarded a contract in connection with the construction of a new heat and power plant in Saudi Arabia that required Siemens Energy to manufacture and supply equipment that was part of the Joint Venture's product line and was not within the production or capabilities of Siemens until Siemens Energy took over the Joint Venture's operations.

- In July 2020, Siemens Energy was selected to provide compressor systems for Saudi Aramco's Hawiyah Unayzah Gas Reservoir Storage project.  Siemens Energy was unable to fulfill that order until it commandeered the technology, operations, and personnel of the Joint Venture.

- As confirmed by a press release on its website entitled "Siemens Energy Compressors to Help Saudi Aramco Enhance Production of Major O&G Field," in February 2021, Siemens Energy announced that it had been selected to supply more than 20 high-efficiency compressors – the same type of high-efficiency compressors that were to be manufactured by the Joint Venture – for Saudi Aramco's Tanajib Plant facilities.

- And perhaps most notably, on March 31, 2021, Saudi Aramco signed a 15-year service contract with Siemens Energy, pursuant to which Siemens Energy has become the exclusive provider and servicer of a wide range of turbines and generators for four of Saudi Aramco's major oilfields.

80.    In fact, Siemens Energy has been so successful in hijacking and exploiting contracts and opportunities that rightfully belong to the Joint Venture that it just completed a massive expansion of the Siemens Facility to increase its local capabilities and better service Saudi Aramco.

81.    *Fifth*, Siemens Energy secured these and other contracts that would have been awarded to and fulfilled by the Joint Venture under false pretenses and by misappropriating ARPIC's reputation, goodwill, and long-standing business relationships.  For example, because Siemens Energy knew that the CPA with Saudi Aramco was expressly conditioned on ARPIC's participation in the Joint Venture and the construction of a new facility in Saudi Arabia, Siemens Energy has been mispresenting to and/or concealing from Saudi Aramco the fact that Siemens Energy has unilaterally

taken over the Joint Venture's operations, intentionally excluded ARPIC from the Joint Venture, and prevented the Joint Venture from fulfilling a single Saudi Aramco order or contract. In fact, it was not until earlier this year, when ARPIC learned of Siemens Energy's takeover of the Joint Venture's operations and brought the issue to the attention of Saudi Aramco, that Saudi Aramco first became aware of those unlawful actions.

82.    Upon information and belief, had Saudi Aramco known the truth about Siemens Energy's unlawful actions, Saudi Aramco would have insisted and/or ensured that all of the foregoing orders and contracts be fulfilled by the Joint Venture with ARPIC's full participation and, in turn, ARPIC would have received and/or would continue to receive the related financial benefits.

83.    *Sixth*, Siemens Energy has used ARPIC's name, goodwill, and reputation to divert for its own benefit business opportunities that would have been secured by or awarded to the Joint Venture, ARPIC, ARPIC's affiliates, or other joint ventures in which ARPIC or its affiliates are partners.

84.    In addition, DRG effectuated the commencement and pursuit of an arbitration proceeding before the ICC to hold ARPIC accountable for its capital contribution obligations, the majority of which are attributable to the JV Facility that, by virtue of Siemens Energy's covert and tortious acts, has now been abandoned.

85.    As malicious, Siemens Energy, through the DRG entities it acquired, continues to seek enforcement of a $45 million award that does not account at all for the damages done to ARPIC and ARTC specified in this litigation, including, but not limited to, (i) the substantial commissions owed to ARTC, (ii) the significant past, present, and future profits owed to ARPIC, and (iii) the value of ARPIC's ownership interest in the Joint Venture. Not one of these critical issues was even addressed, much less adjudicated, in the arbitration. Nor could they have been because Siemens Energy is a stranger to the BVA and was not a party to the arbitration.

7.    **Siemens Energy Intentionally Interferes with ARTC.**

86.    Under the SRA, the ASRA, and the SRA Addendum (collectively, the "Sales Agency Agreement"), the DRG entities currently owe ARTC millions of dollars in commissions and fees from, *inter alia*, (a) sales, revenues, transactions, and purchase orders involving, *inter alia*, DRG's sales of Steam and Gas Turbines and other equipment manufactured outside of Saudi Arabia, and (b) the Joint Venture's manufacturing of Steam Turbines and other equipment and servicing of Steam and Gas Turbines and other equipment within Saudi Arabia.

87.    The unpaid commissions owed to ARTC stem from sales, revenues, transactions, and purchase orders that occurred both before and after Siemens Energy's acquisition of DRG.

88.    Since the acquisition of DRG in 2015, Siemens Energy has tortiously interfered with ARTC's rights under the Sales Agency Agreements.

89.    By way of example, but not limitation, Siemens Energy has tortiously interfered with ARTC's rights under the Sales Agency Agreements by causing DRG and its affiliates to (i) breach the Sales Agency Agreements by failing to pay the commissions owed to ARTC, and (ii) unlawfully terminate the Sales Agency Agreements.

90.    In addition, Siemens Energy has directly and intentionally interfered with ARTC's rights under the Sales Agency Agreement by (i) upon information and belief, diverting sales, revenues, transactions, and purchase orders *from* the books of DRG and the Joint Venture to its own books to avoid paying commissions owed *to* ARTC under the Sales Agency Agreements, (ii) keeping for itself the benefits of both the sales generated by ARTC and the commissions owed to ARTC, and (iii) inducing ARTC to forego taking any action related to the outstanding commissions by repeatedly assuring ARTC that the issue would be addressed.

91.    Indeed, as late as 2018, the parties continued to hold meetings and exchange communications at and in which Siemens Energy and/or DRG expressed their intent to pay commissions owed to ARTC.

## CAUSES OF ACTION

### FIRST COUNT
### (ARPIC's Tortious Interference Claim)

92.    ARPIC repeats and re-alleges the allegations in paragraphs 1 through 90 as if fully set forth herein.

93.    The BVA and BVA Amendment (collectively, the "BVA") represent valid and binding contracts between ARPIC and DRH.

94.    Pursuant to the BVA, DRH is prohibited from competing with the Joint Venture and diverting revenues or potential revenues within the Scope of Business from the Joint Venture to DRH or third parties, including Siemens Energy.

95.    Pursuant to the BVA, DRH is obligated to direct potential opportunities within the Scope of Business to the Joint Venture and notify ARPIC when DRH may be engaging in certain business activities in the Scope of Local Operations.

96.    Pursuant to the BVA, ARPIC holds certain governance rights, including, but not limited to, the right to an accounting and reporting of all financial matters related to the Joint Venture, and to receive its proportionate share of the profits of the Joint Venture.

97.    Siemens Energy has direct and indirect control over DRH.

98.    With direct knowledge of the BVA and ARPIC's rights thereunder, Siemens Energy has intentionally and tortiously interfered with those rights by using its control over DRH to cause DRH to breach the foregoing and other provisions of the BVA without justification for doing so.

99.    By way of example, Siemens Energy has caused DRH to (i) purposely exclude ARPIC from all aspects of the Joint Venture, (ii) deny ARPIC its rights to an accounting and reporting of all

financial matters related to the Joint Venture, and (iii) deny ARPIC its right to a proportionate share of the profits of the Joint Venture.

100.     Siemens Energy has also directly and intentionally interfered with ARPIC's rights under the BVA without justification for doing so.

101.     By way of example, Siemens Energy has (i) transitioned the operations and product line of the Joint Venture to itself and the Siemens Facility, and (ii) fulfilled and retained for itself the benefits of the Joint Venture's existing contracts with Saudi Aramco and other customers.

102.     Likewise, Siemens Energy has used the transition of the Joint Venture's operations and product line, as well as ARPIC's goodwill, reputation, trade secrets, and proprietary information, to secure, fulfill, and retain for themselves the full benefit of contracts that neither Siemens nor Siemens Energy was in a position to secure and/or fulfill prior to commandeering the Joint Venture's operations and product line and that would likely have been secured and fulfilled by the Joint Venture and/or that are within the Joint Venture's Scope of Business.  By way of example only:

(a)     Siemens Energy secured and has fulfilled and/or is fulfilling a $600 million contract to supply gas and steam turbines for the Rabigh 2 IPP power plant in Saudi Arabia;

(b)     Siemens Energy was awarded and has fulfilled and/or is fulfilling a contract to manufacture and supply equipment for a new heat and power plant in Saudi Arabia;

(c)     Siemens Energy has been selected to provide compressor systems for Saudi Aramco's Hawiyah Unayzah Gas Reservoir Storage project;

(d)     Siemens Energy has been selected to supply more than 20 high-efficiency compressor trains for Saudi Aramco's Tanajib Plant facilities; and

(e)     Siemens Energy has signed a long term, 15-year service agreement with Saudi Aramco to provide a wide range of turbines and generators for four major oilfields.

103.    Upon information and belief, Siemens Energy is continuing to interfere with and taking for itself the benefits of business opportunities that belong to the Joint Venture and, in turn, ARPIC.

104.    Moreover, Siemens Energy has intentionally, tortiously, and without justification interfered with ARPIC's rights under the BVA through fraudulent, dishonest, malicious, and illegal means, including, but not limited to, purposefully excluding ARPIC from the Joint Venture, and mispresenting to Saudi Aramco and other customers of the Joint Venture that ARPIC remained actively involved in the Joint Venture in order to benefit from ARPIC's name, relationships, and goodwill.

105.    The foregoing were undertaken in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

106.    But for this fraudulent, dishonest, bad faith, and illegal conduct, the lucrative contracts and business opportunities that Siemens Energy has diverted to itself would have been and/or be fulfilled by the Joint Venture and would have substantially benefitted and/or benefit ARPIC.

107.    Siemens Energy has engaged in the foregoing conduct maliciously, knowingly, and with the intent to injure ARPIC by interfering with and depriving ARPIC of its rights under the BVA.

108.    As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

**WHEREFORE**, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

**SECOND COUNT**
**(ARPIC's Common Law Unfair Competition Claim)**

109.   ARPIC repeats and re-alleges the allegations in paragraphs 1 through 90 as if fully set forth herein.

110.   Unfair competition is a tort that occurs when a competitor engages in deceptive, fraudulent, unfair and unconscionable business practices that harm another.  While the universe of actions that constitute unfair competition is broad, typical examples of actionable misconduct under the tort of unfair competition include, without limiting this flexible and equitable doctrine, a competitor passing itself off as being another business; stealing the contractual rights and intellectual property, pricing, and trade secrets of another; misleading or confusing the public or a consumer of goods in a manner that undermines competition; and misappropriating the goodwill of another business to capitalize on that business' name or reputation.

111.   Siemens Energy, through DRH, exercises control over the Joint Venture.

112.   Siemens Energy and ARPIC, via the Joint Venture, compete for the same pool of customers, including, but not limited to, Saudi Aramco.

113.   Saudi Aramco has engaged in business with the Joint Venture and significantly expanded the scope of that business based on its understanding that ARPIC holds a substantial ownership interest and has been able to actively participate in the Joint Venture's operations, as required by the CPA and contemplated by the BVA.

114.   Siemens Energy has stripped ARPIC of its operational and governance role in connection with the Joint Venture and has effectively excluded ARPIC from the Joint Venture.

115.   Siemens Energy, however, has made fraudulent misrepresentations and omissions to Saudi Aramco and other customers of the Joint Venture, causing them to believe that ARPIC remains actively involved in the Joint Venture in order to benefit from ARPIC's name, relationships, and good will.

116.    By virtue of these misrepresentations and omissions, Siemens Energy has secured for itself contracts and business opportunities that would have been secured by or awarded to the Joint Venture, or, alternatively, ARPIC, ARPIC's affiliates, and/or other joint ventures in which ARPIC or its affiliates are partners.

117.    In addition, Siemens Energy has misappropriated the trade secrets and proprietary information that it knew was created by and belonged exclusively to ARPIC to gain a strategic advantage in the marketplace and secure contracts that would likely have been awarded to the Joint Venture, or, alternatively, ARPIC, ARPIC's affiliates, and/or other joint ventures in which ARPIC or its affiliates are partners, including, but not limited to, customer lists and contacts, pricing formulas, bidding strategies, and market analyses and forecasts.

118.    The misappropriated trade secrets and proprietary information have independent economic value, actual or potential, from not being generally known to, and not being readily available by proper means to the general public and only being available to ARPIC's trusted business partners.

119.    Siemens Energy has engaged in these deceptive, fraudulent misrepresentations and omissions and this unfair and unconscionable conduct intentionally and in bad faith.

120.    As a result of this unlawful conduct, ARPIC has suffered, and will continue to suffer, damages exclusive to it, including damages for which there is no adequate remedy at law.

**WHEREFORE**, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) restraints enjoining Siemens Energy from continuing to engage in the foregoing unfair and unlawful practices; (v) reasonable counsel fees and costs; and (vi) such further relief as the Court finds to be fair and just.

## THIRD COUNT
### (ARTC's Tortious Interference Claim)

121.    ARTC repeats and re-alleges the allegations in paragraphs 1 through 90 as if fully set forth herein.

122.    The Sales Agency Agreements represent valid and binding contracts between ARTC and DRG and its affiliates.

123.    Pursuant to the SRA and the SRA Addendum, ARTC is entitled to the payment of commissions on the sale of DRG products, including those products manufactured by the Joint Venture.

124.    Pursuant to the ASRA, ARTC is entitled to the payment of commissions on the sale of field service, repairs, and spare parts related to DRG products, including those products manufactured by the Joint Venture.

125.    Siemens Energy had knowledge of the Sales Agency Agreements, and ARTC's rights thereunder, at the time it acquired DRG and its subsidiaries.

126.    Siemens Energy has knowingly, intentionally, wrongfully, and without justification interfered with ARTC's rights under the Sales Agency Agreements.

127.    By way of example, but not limitation, Siemens Energy tortiously interfered with ARTC's rights under the Sales Agency Agreements by causing the DRG and its affiliates to breach the Sales Agency Agreements by failing to pay the commissions owed to ARTC, and to unlawfully terminate the Sales Agency Agreements.

128.    Siemens Energy also directly and intentionally interfered with ARTC's rights under the Sales Agency Agreement by (i) upon information and belief, diverting sales, revenues, transactions, and purchase orders from the books of the DR Defendants and the Joint Venture to the books of various Siemens' subsidiaries or joints ventures to avoid paying commissions owed to ARTC under the Sales Agency Agreements, (ii) unlawfully retaining for themselves the benefits of both the past and

ongoing sales generated by ARTC and the commissions owed to ARTC as a result thereof, and (iii) inducing ARTC to forego taking any action related to the outstanding commissions by repeatedly assuring ARTC that the issue would be addressed.

129.    Siemens Energy knowingly, intentionally, and wrongfully interfered with ARTC's rights under the Sales Agency Agreements its own benefit and to the detriment of ARTC.

130.    Siemens Energy engaged in such misconduct by using fraudulent and illegal means and in bad faith for the purpose of causing harm or injury to ARTC.

131.    As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARTC's rights under the Sales Agency Agreements, ARTC has suffered, and will continue to suffer, significant harm and injury.

**WHEREFORE**, ARTC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

## FOURTH COUNT
### (ARTC's Unjust Enrichment Claim)
### (Against Siemens Energy)

132.    ARTC repeats and re-alleges the allegations in paragraphs 1 through 90 as if fully set forth herein.

133.    ARTC alleges that Siemens Energy has been unjustly enriched because it and/or entities it acquired, received, and retained the benefit of the revenues from the sale of DRG products, spare parts, and related service in Saudi Arabia generated by ARTC without paying ARTC the substantial commissions owed for those sales.

134.    Permitting Siemens and/or entities it acquired to retain the benefit of the revenues from the sale of DRG products, spare parts, and related service generated by ARTC without paying

ARTC the substantial commissions owed for those sales would unfairly give them the benefit of ARTC's property and efforts.

135.    Equity and good conscience forbid Siemens Energy and/or entities it acquired from retaining the benefit of ARTC's efforts and commissions without having fulfilled their contractual obligations to ARTC or without otherwise paying for the value thereof.

**WHEREFORE,** ARTC demands judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) pre-judgment interest as allowed by law; (iii) reasonable counsel fees and costs; and (iv) such further relief as the Court finds to be fair and just.

<u>**DEMAND FOR JURY TRIAL**</u>

ARPIC and ARTC demand a trial by jury for all claims for which a jury trial is available as a matter of law.

Respectfully submitted,

Dated:  December 8, 2021              By:  _/s/ Ronald D. Edwards, Jr._
                                           Ronny Edwards, Jr., Esq.
                                           Florida Bar No. 0053233
                                           LOWNDES, DROSDICK, DOSTER,
                                             KANTOR & REED, P.A.
                                           215 North Eola Drive
                                           Post Office Box 2809
                                           Orlando, Florida 32802
                                           Phone: (407) 843-4600
                                           Facsimile: (407) 843-4444
                                           ronald.edwards@lowndes-law.com
                                           lit.control@lowndes-law.com
                                           tracy.kennison@lowndes-law.com

                                           - and -

                                           Eric T. Kanefsky, Esq.
                                           (pro hac to be filed)
                                           Kevin J. Musiakiewicz, Esq.
                                           (pro hac to be filed)
                                           CALCAGNI & KANEFSKY LLP
                                           One Newark Center
                                           1085 Raymond Blvd., 14th Fl.

Newark, New Jersey 07102
(862) 397-1796

Counsel for Plaintiffs

0886119\195805\11609006v3