**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| AL RUSHAID PETROLEUM INVESTMENT COMPANY and AL RUSHAID TRADING COMPANY, | |
| Plaintiffs, | **FIRST AMENDED COMPLAINT** |
| vs. | **Case No. 6:21-cv-02062-WWB-EJK** |
| SIEMENS ENERGY, INC., | |
| Defendant. | |

Plaintiffs Al Rushaid Petroleum Investment Company ("ARPIC") and Al Rushaid Trading Company ("ARTC" and, together with ARPIC, "Al Rushaid"), as and for their First Amended Complaint against Defendant Siemens Energy, Inc. ('Siemens Energy"), allege as follows:

**<u>INTRODUCTION</u>**

1.      For more than forty years, Al Rushaid has played an important role in the development of Saudi Arabia's oil and gas industry and aided foreign manufacturers of oilfield equipment in gaining access to the lucrative Saudi market.

2.      Al Rushaid's value to foreign companies is exemplified by the success that it achieved in Saudi Arabia for Dresser Rand Group ("DRG").

3.      Pursuant to exclusive sales representation agreements between ARTC and DRG, Al Rushaid introduced DRG's turbines, compressors, and other reciprocating products to the Middle East and developed widespread recognition of the DRG brand.

4.      It also helped DRG secure a long-term contract with Saudi's most coveted and influential customer, the Saudi Arabian Oil Company ("Saudi Aramco"), that promised to yield hundreds of millions in equipment sales and even more in ongoing service and maintenance revenues.

5.      Because Al Rushaid was such an integral part of the deal and trusted business partner of Saudi Aramco, Saudi Aramco insisted that the contract be fulfilled by a joint venture (the "Joint Venture") owned and operated by affiliates of DRG *and* ARTC— namely, Dresser-Rand Holdings (Netherlands) B.V. ("DRH") and ARPIC.

6.      Yet, by the time Siemens Energy acquired DRG and its affiliates in 2015 for $6.4 billion, ARPIC and ARTC had already enabled DRG, through the Joint Venture, to establish a profitable, long-term business and contractual relationship with Saudi Aramco.

7.      Moreover, the extraordinary expenses associated with the Joint Venture's construction of a $55 million, state-of-the-art facility and other start-up obligations had already been incurred; the long-awaited and substantial profits from the sale of equipment, service, and maintenance were about to be realized; Saudi law no longer required ownership by a Saudi-based partner; Siemens had a long-standing, exclusive relationship with another prominent Saudi agent that was well-positioned to effectuate sales in place of ARTC; and the confidential and proprietary information of ARPIC critical to the success of the Joint Venture had already been disclosed.

8.      Thus, by Siemens Energy's own admission, ARPIC and ARTC became expendable.

9. Siemens Energy therefore engaged in a deliberate scheme to interfere with the clear contractual rights of ARPIC and ARTC and deny ARPIC and ARTC the benefits of the business relationships, contracts, and opportunities they had forged.

10. *First*, as ARPIC first learned in 2019, Siemens Energy has been tortiously interfering with ARPIC's contractual rights by secretly transitioning the Joint Venture's operations to Siemen's own facility, and using the Joint Venture's product line and personnel, as well as ARPIC's confidential and proprietary information, to fulfill the very purchase orders that the Joint Venture was formed to fulfill.

11. *Second*, Siemens Energy has repeatedly interfered with ARPIC's contractual rights by securing and fulfilling other extremely lucrative contracts and opportunities with Saudi Aramco that fall within the Joint Venture's Scope of Business and, but for Siemens Energy's interference, would have been awarded to and fulfilled by the Joint Venture.

12. Those contracts and opportunities include, but are not limited to the following:

(i) in 2017, Siemens Energy began fulfilling a contract in connection with the construction of a new heat and power plant in Saudi Arabia that required the company to manufacture and supply equipment that is part of the Joint Venture's product line;

(ii) in July 2020, Siemens Energy contracted with Saudi Aramco to provide compressor systems for the Hawiyah Unayzah Gas Reservoir Storage project that included DRG legacy products and other equipment within the scope of the Joint Venture's business;

(iii)     in February 2021, Siemens Energy contracted with Saudi Aramco to supply more than 20 high-efficiency compressor trains within the Joint Venture's product line for Saudi Aramco's Tanajib Plant facilities; and

(iv)     in March 2021, Siemens Energy signed a 15-year service agreement with Saudi Aramco, pursuant to which Siemens Energy is providing and will continue to provide, service, and maintain a range of turbines and generators within the Joint Venture's product line for Saudi Aramco's four largest oilfields.

13.     In fact, the Saudi Aramco business that Siemens Energy has diverted from the Joint Venture has become so expansive and profitable that Siemens Energy recently completed a massive expansion of the Siemens Facility (as defined below) so that it could better service Saudi Aramco.

14.     *Third*, Siemens Energy has interfered with ARPIC's contractual rights by causing DRH to breach the agreements governing the Joint Venture and engage in business that competes directly with the Joint Venture.

15.     *Fourth*, Siemens Energy has engaged in unfair competition by purposely excluding ARPIC from the Joint Venture and its operations and, nevertheless, falsely representing to Saudi Aramco and other customers that ARPIC has remained actively involved.

16.     *Fifth*, Siemens Energy has interfered with ARTC's contractual rights by causing DRG and its affiliates to breach the sales representation agreements and deny ARTC millions in commissions to which it is entitled.

17.    The purpose of this action is to hold Siemens Energy accountable for these unlawful acts by imposing appropriate monetary and reputational damages resulting therefrom.

## JURISDICTION and VENUE

18.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.  ARPIC and ARTC are citizens of the Kingdom of Saudi Arabia and Siemens Energy is a citizen of Delaware.

19.    Personal jurisdiction is proper over Siemens Energy because, among other factors, (i) Siemens Energy is headquartered in Orlando, Florida, (ii) Siemens Energy is registered to do business in Florida, and (iii) Siemens Energy's contacts and affiliations with Florida are so continuous and systematic as to render it essentially at home in Florida.

20.    Venue is proper in this District under 28 U.S.C. § 1291(b)(2) and (3) because, among other reasons, (i) Siemens Energy maintains its principal place of business in Orlando, Florida, (ii) Siemens Energy is registered to do business in Florida, and (iii) a substantial part of the conduct and events giving rise to this action occurred in and/or originated from Orlando, Florida.

## PARTIES

21.    ARPIC is a company organized under the laws of the Kingdom of Saudi Arabia with Commercial Registration Number 2051007604 and its registered address at P.O. Box 31685, Al Khobar 31952, Saudi Arabia.

22.    ARTC is a company organized under the laws of the Kingdom of Saudi Arabia with Commercial Registration Number 2051006882 and its registered address at P.O. Box 31685, Al Khobar 31952, Saudi Arabia.

23.    Siemens Energy is a Delaware corporation. Siemens Energy is headquartered in Orlando, Florida (https://www.siemens-energy.com/us/en.html), with its principal place of business located at 4400 Alafaya Trail, Orlando, Florida.  Siemens Energy is also registered to do business in Florida.

## COMMON ALLEGATIONS OF FACT

24.    Prior to mid-2016, companies from outside the Middle East seeking to do business in Saudi Arabia faced significant challenges.

25.    For instance, only companies from Saudi Arabia, Kuwait, Qatar, Oman, Bahrain, and the United Arab Emirates were permitted to engage in trading and retail activities without a local Saudi partner.

26.    Thus, partnering with a Saudi-based entity was legally, politically, and practically essential for foreign companies wishing to sell or distribute their products to Saudi customers, or to manufacture and/or service products in Saudi Arabia.

27.     Since its inception in 1978, Al Rushaid has acted as the Saudi partner for innovative companies from around the world seeking to respond to the development needs of Saudi Arabia and penetrate the Saudi market.

28.    ARTC played a particularly prominent role in the Saudi economic landscape, helping foreign companies establish contacts in Saudi's oil and gas industry and achieve significant sales of their products and services in the Saudi marketplace.

**A.    Al Rushaid Establishes DRG's Presence in Saudi Arabia.**

29.    More than thirty years ago, executives of DRG, then a relatively modest-sized manufacturer of certain turbines and compressors for the oil and gas industry with limited reach beyond the United States, formed a business relationship and friendship with Al Rushaid's former Chairman and CEO, Sheikh Abdullah Al Rushaid, and engaged ARTC to introduce and develop DRG's brand in Saudi Arabia, with a particular focus on Saudi Aramco.

30.    With over 76,000 employees and annual revenues of over $300 billion, Saudi Aramco effectively controls the Saudi oil and gas market and is one of the largest grossing companies in the world.

31.    In January 1994, Dresser-Rand International B.V. ("DRIBV") and ARTC entered a sales representation agreement (the "SRA"), pursuant to which ARTC became the exclusive agent for the sale of certain DRG products in Saudi Arabia.[1]

32.    The SRA granted ARTC "the exclusive right to solicit orders for the 'Products' within the 'Territory', which shall consist of: Kingdom of Saudi Arabia."

---

[1] Upon information and belief, DRIBV later assigned its rights and obligations under the SRA to D-R International Sales, Inc. ("DRIS"). DRIS was then merged into DRG, which assumed DRIS's rights and obligations under the SRA.

33.     The SRA defined the "Products" to include small gas turbines, large gas turbines, and compressors, as well as spare parts purchased along with the foregoing items.

34.     The SRA entitled ARTC to commissions of 2.5% of the net sales price of all "Products" and spare parts purchased with each "Complete Unit."

35.     Consistent with DRG's long-term belief that spare parts, service, and maintenance would be a source of strong, recurring revenues, DRIBV and ARTC also entered into an Aftermarket Sales Representation Agreement (the "ASRA").

36.     The ASRA granted ARTC the exclusive right to solicit orders in Saudi Arabia for the "field service, repairs and spare parts" related to the same Products encompassed by the SRA.

37.     The ASRA also assigned to ARTC a ten percent (10%) commission for all such sales.

38.     The SRA and the ASRA contained the same general provisions.

39.     Under the SRA and the ASRA, ARTC faithfully and successfully served as DRG's sales agent, effectuating large-scale sales of DRG products, introducing DRG to strategic partners in the region and building a substantial presence for DRG in the Saudi market.

40.     For instance, from 2005 to 2009 alone, ARTC generated tens of millions in sales for DRG and earned substantial commissions as a result of those sales.

41.     As of early 2009, DRG owed ARTC millions in commissions pursuant to the SRA and the ASRA (the "Pre-JV Commissions").

**B.    Al Rushaid Secures an Award to DRG of a Lucrative Corporate Procurement Agreement with Saudi Aramco.**

42.    By virtue of Al Rushaid's reputation in the Saudi oil and gas arena, as well as the tireless efforts of ARTC to build DRG's brand in the region, DRG was awarded the opportunity to do business with Saudi Aramco in or about March 2009.

43.    Under the Corporate Procurement Agreement (the "CPA"), DRG was required to enter the Joint Venture with an entity operating under Al Rushaid's umbrella and manufacture, service, and repair large single-stage steam turbines ("SSTs"), compressors, and other equipment for Saudi Aramco's oil and gas projects (collectively, "Steam Turbines").

44.    As Vince Volpe, DRG's former President and CEO emphasized, the CPA was a big step for DRG in solidifying its position in the Middle East markets and its relationship with Saudi Aramco:

> Part of our strategic plan clearly identified the need for a strong unified approach to our Middle East markets, including the opportunity to better service our clients with more local presence.  The agreement with Saudi Aramco, one of the world's largest oil producers, is a leap forward for us.  We have worked closely with Saudi Aramco to better understand their requirements, and after extensive review, we are honored to have been selected as the first manufacturer to supply our full range of compressor and steam turbine products under the Corporate Procurement Agreement.

45.    The CPA also promised to be lucrative.

46.    According to DRG's financial forecasts, the revenues for the sale of the equipment alone were anticipated to exceed $140 million, and the revenues for the maintenance and repairs were expected to be much greater.

47.     It was understood that the early years of the Joint Venture would be laden with heavy expenses associated with the construction of a facility and infrastructure and ramping up the operation.

48.     DRG was aware that the true value of the CPA and other contracts was the long-term, recurring revenue that the Joint Venture would eventually earn from the aftermarket sale of spare parts, repairs, and maintenance to Saudi Aramco and other customers.

49.     As DRG later underscored in its 10-K Financial Statements, it was the aftermarket parts and service that promised to provide "long-term growth opportunities":

> We continue to believe that the aftermarket parts and services segment provides us with long-term growth opportunities. Aftermarket parts and services are generally less sensitive to business cycles than the new units segment, although revenues and bookings tend to be higher in the second half of the year. **With a typical operating life of 30 years or more, rotating equipment requires substantial aftermarket parts and services over its operating life. Parts and services activities realize higher margins than new unit sales**. Additionally, the cumulative revenues from these aftermarket activities often exceed the initial purchase price of the unit. Our aftermarket parts and services business offers a range of services designed to enable clients to maximize their return on assets by optimizing the performance of their mission-critical rotating equipment. . . .

> We believe we have the largest installed base of the classes of equipment we manufacture and the largest associated aftermarket parts and services business in the industry. Many of the units we manufacture are unique and highly engineered, and servicing these units requires knowledge of their design and performance characteristics. We estimate that we currently provide approximately 57% of the supplier-provided aftermarket parts and services needs of our own manufactured turbo products, reciprocating compressors and steam turbines and less than 5% of the supplier provided aftermarket parts and services needs of these same classes of equipment of other manufacturers. We focus on a global offering of technologically advanced aftermarket products and

services, and as a result, our aftermarket activities tend to be concentrated on the provision of higher value-added parts and upgrades and the delivery of sophisticated operating, repair and overhaul services. Small independent companies tend to focus on local markets and have a more basic aftermarket offering.

A significant portion of our installed base is serviced in-house by our clients. However, we believe there is an increasing trend for clients to outsource this activity, driven by declining in-house expertise, cost efficiency and the superior service levels and operating performance offered by OEM service providers. We believe the steady demand for aftermarket parts and services from our installed base represents a stable source of recurring revenues and cash flow. Moreover, with our value-based solutions strategy, we have a demonstrated track record of growth in this segment as a result of our focus on expanding our service offerings into new areas, including servicing other OEMs' installed base of equipment, developing new technology upgrades, increasing our penetration of higher value-added services to our own installed base and extending our served markets through acquisitions in contiguous markets such as gas and diesel engine repair, gas turbine repair, steam turbine trip and throttle valves, foundation repair and emission control technologies for integral gas engines.

Because equipment in our industry typically has a multi-decade operating life, we believe aftermarket parts and services capability is a key element in both new unit purchasing decisions and sales of service contracts.

(Emphasis added).

### 1.     Conditions of the Corporate Procurement Agreement.

50.     Saudi Aramco awarded the CPA to DRG subject to two critical conditions.

51.     *First,* because of the trust and rapport that Al Rushaid had developed with Saudi officials and Saudi Aramco, the CPA required that DRG form a joint venture with an entity within the Al Rushaid Group as its local partner under the name of "Dresser Arabia, LLC" to fulfill the purchase orders for the production service, and maintenance of certain products, including Steam Turbines.

52.    *Second*, the CPA required that the Joint Venture construct a facility in Saudi Arabia to fulfill the purchase orders, as well as develop employment opportunities and other local content.

53.    These requirements were memorialized in the Local Content Accord to the CPA.

54.    The "Statement of Commitment" in the Local Content Accord expressly documented DRG's commitment to the formation of the Joint Venture and construction of a new facility to fulfill the purchase orders:

> Dresser-Rand commits to open Dresser-Rand Arabia LLC in the Kingdom.  The activities that will be performed in this facility are described in detail in the CPA [L]ocal Content Accord.

55.    The Local Content Accord specified the size and timeline for completion of the new facility to be constructed by the Joint Venture.

56.    The Local Content Accord defined the "Scope of Local Operations" to be performed by the Joint Venture to include, *inter alia*: (i) "[t]he manufacturing of Dresser-Rand general purpose steam turbines"; (ii) "[t]he packaging of Dresser-Rand centrifugal and reciprocating compressors, including drivers such as motors and turbines"; (iii) "[t]he repairing, revamping and upgrading of Dresser-Rand name plate (namely, steam turbines, turbo-compressors, reciprocating compressors, gas turbines . . . , valves, gas seals) as well as non-name plate compressors (including internally geared compressors), electronic motors, generators, and steam, power and gas turbines"; and (iv) "[t]he provision of technical support services in relation to turbines, compressors, motors, and generators, including installation, systems integration, maintenance, project management, condition monitoring, parts inventory management, and training."

57.     The Local Content Accord required the Joint Venture to maximize the employment of Saudi-based engineers and other workers and to hire existing Saudi Aramco employees.

58.     The CPA also underscored the substantial focus placed on service, repair, and maintenance.

59.     For example, the Local Content Accord expressly acknowledges that DRG agreed to form the Joint Venture and build a new facility "in consideration of Saudi Aramco's intention to outsource repairs for rotating equipment."

60.     In addition, the CPA included a General Services Agreement, pursuant to which DRG agreed to "furnish all facilities, machine tools, hand tools and equipment for the Transportation, Inspection, Overhaul, Repair, Exchange, Materials and Spare Parts Inventory Management, Life Cycle Advantage Surveys/Field Programs and Training for various types of [DRG] and other Equipment including Centrifugal Compressors, Steam Turbines, Gas Seals, Pumps and Parallel Shaft Gearboxes" via the Joint Venture.

**2.    ARPIC and a DRG Affiliate Enter into Business Venture Agreement Creating a Co-Owned Joint Venture to Profit from the CPA with Saudi Aramco and Engage in Producing and Servicing Oilfield Equipment.**

61.     Because the CPA was conditioned on the formation of a joint venture with an Al Rushaid entity and Saudi law then required joint ventures to have a Saudi-based partner, DRG asked ARPIC to become its partner in the Joint Venture.

62.     To induce ARPIC to enter the Joint Venture, DRG assured ARPIC that the Joint Venture would be profitable for both parties.

63.     DRG specifically represented to ARPIC that, though the construction of a new facility may consume most of the revenues in the early years, locally manufacturing equipment critical to the production of oil and gas would give the Joint Venture a

stronghold in the Saudi market, and the revenue that would be derived from the service and maintenance of equipment owned by Saudi Aramco and other customers would be substantial, recession-proof, and long-lasting.

64.     DRG also convinced Al Rushaid to forego ARTC's collection of the Pre-JV Commissions based on promises that the profit distributions ARPIC would receive through the Joint Venture would easily eclipse the monies that were then due and owing to ARTC.

65.     On or about March 18, 2009, ARPIC and a DRG affiliate, DRH, entered a Business Venture Agreement (the "BVA") for the purpose of governing the Joint Venture created to fulfill the requirements of the CPA and to complete the purchase orders for equipment, service, and maintenance issued thereunder.

66.     The importance of ARPIC's participation and its familiarity with the Saudi laws, rules, practices, and business customs was underscored in the "Statement of Intent" to the BVA:

> ARPIC is engaged in business in the Kingdom of Saudi Arabia and has knowledge of the laws, regulations, customs and practices essential to successful business ventures in such jurisdiction.

67.     The minutes of DRG's Board of Directors meeting held in January 2009 in anticipation of the CPA similarly made clear that DRG considered ARPIC a trusted partner with strong ties to Saudi Aramco and critical to the success of the Joint Venture:

> At Mr. Macaulay's invitation, Mr. Volpe provided an overview of his visit with management of Saudi Aramco in December and the Company's interest in signing a Corporate Procurement Agreement with Saudi Aramco.  He explained that Saudi Aramco was interested in working with Dresser-Rand and facilitating its interest to develop a local presence in Saudi Arabia.  He noted that enhancing the Company's

presence in the Kingdom and region was consistent with the strategy that had been supported by the Board to focus on geographic penetration. He commented upon the strong opportunities with Saudi Aramco and that the proposed facility would serve other clients both within and outside the Kingdom.

Mr. Volpe explained that management was proposing to enter into a joint venture with the Al Rushaid Petroleum Investment Company ("ARPIC"). The Company has been involved with Sheik Abdullah Al-Rushaid for over 25 years by virtue of his affiliate serving as a sales representative of the Company. Mr. Volpe explained the benefits of working with ARPIC and the key governance mechanisms that would be put in place.

\* \* \* \* \*

Mr. Macaulay noted that companies he had been associated with had done business with Sheik Al-Rushaid for years and that Sheik Al-Rushaid was well regarded by them.

68. In fact, as recently as 2017, DRG reaffirmed its belief that by affiliating with ARPIC, it would gain credibility with Saudi Aramco and other potential customers and facilitate compliance with local Saudi requirements.

### 3. The Joint Venture's Scope of Business and the BVA's Non-Competition Provisions.

69. Pursuant to the BVA, it was agreed that the Joint Venture would fulfill all purchase orders issued to DRG by Saudi Aramco that fell within the "business" of the Joint Venture.

70. The "business" was defined to include the same equipment and services as the "Scope of Local Operations" set forth in the CPA (collectively, the "Scope of Business"), namely:

a. manufacturing SSTs;

b. packaging centrifugal and reciprocating compressors, including drivers such as motors and turbines;

    c.      repairing, revamping and upgrading DR brand and non-DR brand equipment; and

    d.      providing technical support services in relation to turbines, compressors, motors, and generators.

71.    At the same time, the BVA restricts the parties' right to compete with the Joint Venture by, *inter alia*, (i) generally prohibiting direct competition within the Scope of Business when occurring in the Scope of Local Operations, and (ii) imposing disclosure and notice requirements that are triggered when any party to the BVA intends to engage in business activities in the Scope of Local Operations from which the Joint Venture could benefit or that is arguably competitive with the Joint Venture.

72.    It also imposes affirmative obligations on the owners of the Joint Venture to, in certain circumstances, prioritize the Joint Venture's business opportunities over their other business ventures in Saudi Arabia.

73.    For instance, the BVA requires the parties to "facilitate the Company's ability to purchase, service, and support orders within the Scope of Business."

**4.    The BVA and the SRA Are Amended to Confirm and Enhance the Rights of ARPIC and ARTC.**

74.    In April 2013, DRH and ARPIC entered an Amendment to the BVA (the "BVA Amendment") and DRG and ARTC entered an Addendum to the SRA (the "SRA Addendum") confirming and enhancing the rights of ARPIC and ARTC.

(a)    The BVA Amendment expressly acknowledged that there were commissions owed to ARTC and that ARPIC would receive a credit for those commissions against ARPIC's capital contribution obligations to the Joint Venture.

(b)     The BVA Amendment provided for the termination of an existing sales representation agreement with Binzagr Company ("Binzagr"), pursuant to which Binzagr was appointed as the exclusive sales agent for all equipment manufactured by Dresser Arabia, so that ARTC could replace Binzagr as Dresser Arabia's exclusive agent pursuant to the SRA Addendum.

(c)     The SRA Addendum amended the SRA to include the SSTs and compressors manufactured by Dresser Arabia in the "Products" that ARTC was authorized to sell.

(d)     The SRA Addendum increased ARTC's commissions rate for the sale of all "Complete Units" to two percent (2%) of the net sales price.

(e)     The SRA Addendum confirmed that ARTC was owed commissions for previous sales to the Saudi Aramco Total Refining and Petroleum Company.

(f)     The SRA Addendum expressly acknowledged that, in addition to commissions earned by ARTC, ARPIC would "continue to participate in the distributed profits of [Dresser Arabia] in proportion to its ownership interests, which may include profit from sales by [Dresser Arabia] of steam turbines and aftermarket services for gas turbines."

**5.     The Joint Venture Constructs a State-of-the-Art Facility in Saudi Arabia and Positions Itself to Dominate the Local Market.**

75.     From shortly after its formation in 2009 to 2013, the Joint Venture leased facility space in Jubail from Cleveland Bridge Arabia Limited to fulfill purchase orders issued pursuant to the CPA and for other projects while plans for the construction of a new facility were being discussed and finalized.

76.     Despite ARPIC's vehement objections to the new facility proposed by DRH—including that the projected costs were exorbitant, that it would be more cost effective to refurbish the leased facility at Jubail, and that the contractor engaged to construct the new facility was overpriced—DRH insisted on pressing forward with the construction of a new facility in the Dammam Second Industrial City (the "JV Facility").

77.     The JV Facility was completed in 2013 at a total cost of approximately $55 million and became operational in 2014.

78.     The JV Facility is state-of-the-art and utilizes technology unparalleled in the Middle East.

79.     For example, the JV Facility has the capability to: (i) package compressors with the ability to lift packages weighing up to 120 tons, which would, in turn, enhance the capabilities and efficiencies of the oilfield applications of Saudi Aramco and other producers of oil and gas in the region; and (ii) not only manufacture the SSTs, but also test run them in the JV Facility after manufacture or repair.

80.     The JV Facility is also equipped with CNC ("computer numerical code")-controlled tools that allow for the efficient production of custom-designed parts tailored for the needs of the Saudi market.

81.     Finally, the JV Facility houses a vacuum high-speed balance machine, thereby providing Middle East clients with the convenience and expediency of having their critical rotors serviced in Saudi Arabia as opposed to the delay and cost of shipping them to Europe or the United States.

82.    Because the JV Facility had the capacity to mass manufacture, service, and repair equipment essential to meeting the increasing needs of Saudi Arabia's oil and gas industry, the Joint Venture was poised to dominate the market and become one of the largest, if not the largest, suppliers and servicers of turbines, compressors, and reciprocating equipment to Saudi Aramco and other customers in the Middle East.

83.    In fact, the completion of the JV Facility coincided with a significant ramp up of intensity in oil drilling in Saudi Arabia.

84.    As of 2014, Saudi Aramco was investing heavily in new wells and new production infrastructure, both for existing fields and to bring new fields onstream.

85.    The JV Facility was particularly significant for DRG because it was DRG's only physical plant in the Middle East and gave it significant logistical advantages over its competitors with operations confined to the United States and Europe.

86.    The Joint Venture also had significant business advantages over its competitors because of ARPIC's participation.

87.    For example, ARPIC disclosed to DRG confidential and proprietary information that ARPIC was diligent in protecting and shared only with trusted business partners and were critical to the success of the Joint Venture, including, but not limited to, customer lists and contacts, pricing formulas, bidding strategies, and market analyses and forecasts.

88.     By virtue of this and other confidential and proprietary information developed by and belonging exclusively to ARPIC, the Joint Venture was armed to excel in Saudi Arabia's highly restrictive oil and gas market, as well as navigate the politics, intricacies, and complexities of maintaining and growing a relationship with Saudi Aramco.

**6.     The Joint Venture Expands its Scope.**

89.     At or about the same time that the JV Facility was completed, DRG and ARPIC agreed to expand the Joint Venture's Scope of Business.

90.     On May 20, 2014, DRH and ARPIC entered a Shareholders' Resolution to amend the Articles of Association to establish a services branch of the Joint Venture for the operation, repair, maintenance and technical support services of industrial and heavy equipment, pumps, and instruments for oil, gas and other industries regardless of whether such equipment was manufactured by Joint Venture.

**7.     After Acquiring DRG and its Subsidiaries, Siemens Energy Causes Them to Breach the BVA and SRA and Divert Revenues and Business Opportunities from the Joint Venture.**

91.     Despite its size, diversity, and worldwide reach, Siemens had no meaningful presence or production in the oil and gas industry through at least 2010.

92.     Though it had long been a leading manufacturer of gas turbines and compressors, that equipment was limited to power generation for building-based industrial applications and processes, as well as for rail, air, and water transportation.

93.     Siemens had formed a partnership with Juffali, a prominent, Saudi-based commercial agent, as early as the 1960s.

94.     But, as of 2010, Siemens did not have the engineering, product line, ability, or capacity to fulfill the field-based needs of Saudi Aramco and other producers of oil and gas in the Middle East.

95.     Commencing in or about 2010, Siemens began to implement its plan to enhance its local presence in Saudi Arabia and become a pivotal player in the oil and gas industry.

96.     In or about 2011, Siemens, together with Saudi Aramco and Saudi Electricity Company, jointly committed to build turbine manufacturing facilities in the Dammam Industrial District known as the "Siemens Dammam Energy Hub" (the "Siemens Facility").

97.     The Siemens Facility provided Siemens with a physical presence in the region.

98.     In 2014, Siemens announced that it had reached an agreement whereby Siemens Energy would acquire DRG by way of a friendly takeover and purchase of its stock.

99.     According to statements issued by Siemens, the Joint Venture was attractive to Siemens Energy for many reasons.

100.    First and foremost, the acquisition would expand Siemens' product line to include large steam and gas turbines, compressors, and other reciprocating equipment, and, in turn, greatly improve Siemens' position in the oil and gas market.

101.    For example, in a power point presentation dated September 2014 and entitled "Executing Vision 2020 – Acquisition of Dresser Rand," Siemens boasted about DRG's "well balanced & strong portfolio" in oil and gas.

102.    Siemens specifically emphasized that: (i) DRG was responsible for the lion's share of all installed turbines and compressors in the oil and gas industry; (ii) DRG's portfolio consisted of important products—including reciprocating compressors, high-speed engines, small gas turbines, axial expanders, and micro LNG—that were not part of Siemens' existing portfolio; and (iii) even where there was some overlap, such as with compressors and steam turbines, the focus of the companies' respective products was very different—DRG's products focused on oil and gas whereas Siemens' products focused on industrial applications.

103.    Thus, as Siemens put it: "Together, Dresser-Rand and Siemens [would] offer a highly attractive portfolio for oil & gas customers."

104.    The combination of their distinct product lines, according to Siemens' projections, allowed for annual growth in the industry at a rate of six to eight percent (6% to 8%).

105.    As Siemens boasts on its website, Siemens Energy now collectively "offers a comprehensive portfolio of turbo and reciprocating compression solutions for the Oil and Gas Industry and other process industries," which includes products that were exclusive to Dresser-Rand and/or the Joint Venture prior to the acquisition.

106.    For example, the Siemens Energy website states:

<u>Gas Turbines for Oil and Gas Applications</u>

For power generation in upstream, midstream and downstream applications as well as mechanical drives for compressors and pumps, Siemens gas turbines are proven and trusted in the industry.  They ensure outstanding reliability for oil and gas production and processing as well as pipeline, LNG and refinery applications.

<u>Axial Compressors</u>

The ideal match for high volume air compression as required in large air separation units or for catalyst regeneration in selected petrochemical and refining processes.

<u>Reciprocating Compressors</u>

Our line of reciprocating compressors has an outstanding record for performance, efficiency, reliability, and low maintenance in the most demanding upstream, midstream, and downstream applications.

107.    The Joint Venture was particularly attractive to Siemens because Saudi Aramco was investing heavily in an expansion of its operations and the combination of the Joint Venture's unique ability to manufacture and service field equipment, its long-term, lucrative relationship with Saudi Aramco, and the proprietary information and trade secrets shared by ARPIC, would provide Siemens with a "turn key," low-risk entry into and ability to grow in the Saudi oil and gas market.

108.    The acquisition via Siemens Energy also allowed Siemens to reap the long-term benefits of DRG's service and repair revenues.

109.    As Siemens touted in its PowerPoint presentation, DRG's "service revenue streams via large installed bases"—which then accounted for fifty percent (50%) of DRG's total revenues—would provide Siemens with "[s]olid double digit profit margins" "from day one."

### a.    ARPIC and ARTC Become Expendable.

110.    By the time the acquisition was completed in mid-2015, ARTC became expendable to Siemens and DRG because Siemens already had a long-standing sales agency relationship with Juffali, which could fill ARTC's role in effectuating the sale of DRG products in Saudi Arabia and other parts of the Middle East.

111.    Siemens and Juffali had been working together for more than fifteen years.

112.    In addition, ARPIC had already divulged its confidential intelligence and strategy for navigating and breaking new ground in the complex Saudi market and fostering and furthering the relationship with Saudi Aramco.

113.    Likewise, ARPIC's participation in the Joint Venture was no longer necessary or desirable because (i) the Joint Venture had already endured the expense-laden start-up period associated with the construction of the JV Facility and was about to earn the long-awaited profits yielded by the service, repair, and maintenance, and (ii) Saudi law no longer required the participation of a Saudi-based partner in a joint venture.

### b.    Siemens Energy Intentionally Interferes with ARPIC.

114.    Siemens Energy therefore launched a strategic, multi-faceted campaign to interfere with and injure ARPIC.

115.    *First*, as ARPIC first learned in 2019, Siemens Energy is tortiously interfering with ARPIC's contractual rights under the BVA and BVA Amendment by fulfilling purchase orders issued under the CPA outside of the Joint Venture and denying ARPIC its proportionate share of the related benefits.

116.    *Second*, Siemens Energy has repeatedly engaged in separate and distinct acts of tortious interference with ARPIC's rights under the BVA and BVA Amendment by using the Joint Venture's product line and personnel, as well as ARPIC's proprietary information and trade secrets, to secure and fulfill other contracts and opportunities that fall within the Joint Venture's Scope of Business and, but for Siemens Energy's interference, would have been awarded to and fulfilled by the Joint Venture.

117.    These separate acts of tortious interference include, but are not limited to, the contracts that immediately follow.

118.    In or about 2017, Siemens was awarded a contract in connection with the construction of a new heat and power plant in Saudi Arabia that required Siemens Energy to manufacture and supply equipment that was part of the Joint Venture's product line and was not within the production or capabilities of Siemens until Siemens Energy took over the Joint Venture's operations.

119.    In July 2020, Siemens Energy entered a contract with Saudi Aramco to provide compressor systems for the Hawiyah Unayzah Gas Reservoir Storage project that included DRG legacy products such as DATUM centrifugal compressors and other equipment within the Joint Venture's Scope of Business and, thus, could not have been fulfilled by Siemens Energy until it commandeered the technology, operations, and personnel of the Joint Venture.

120.    As confirmed by a press release on its website entitled "Siemens Energy Compressors to Help Saudi Aramco Enhance Production of Major O&G Field," in February 2021, Siemens Energy contracted with Saudi Aramco to supply more than 20 high-efficiency compressors—the same type of high-efficiency compressors that were to be manufactured and serviced by the Joint Venture—for Aramco's Tanajib Plant facilities.

121.    And on March 31, 2021, Saudi Aramco signed a 15-year service contract with Siemens Energy, pursuant to which Siemens Energy has become the exclusive provider and servicer of a wide range of turbines and generators within the Joint Venture's Scope of Business for four of Saudi Aramco's major oilfields.

122.    In a sworn affidavit filed with the Court on February 11, 2022, Waleed Sheikh, an employee of Siemens Energy and the former Deputy General Manager of the Joint Venture, admitted that only "some of the [foregoing] contracts . . . [were] outside the scope of the Joint Venture." (D.E. 17-1).    In other words, Siemens Energy itself has conceded that at least some of the foregoing contracts are within the Joint Venture's Scope of Business.

123.    Siemens Energy has been so successful in hijacking and exploiting contracts and opportunities that would otherwise have been awarded to and fulfilled by the Joint Venture that it just completed a massive expansion of the Siemens Facility to increase its local capabilities and better service Saudi Aramco.

124.    Siemens Energy's use of DRG's product line is not limited to securing opportunities in Saudi Arabia. For example:

a.    in March 2017, Siemens Energy supplied four Siemens SGT-700 gas turbines driving legacy Dresser-Rand compressors to Oman's Liwa Plastic Industries complex;

b.    in April 2017, Siemens supplied two legacy Dresser-Rand DATUM compressors driven by Siemens electric motors for the Mad Dog 2 Project in the Gulf of Mexico; and

c.    in January 2019, Siemens Energy supplied a Siemens SGT-750 gas turbine driving two legacy Dresser-Rand DATUM compressors to Encana's Pipestone processing facility in Canada.

125.    *Third*, Siemens Energy has tortiously interfered with ARPIC's contractual rights by causing DRH to breach the BVA and BVA Amendment and engage in contracts and business relationships that compete with the Joint Venture.

126.    *Fourth*, Siemens Energy has engaged in unfair competition to divert foregoing and other contracts that belong to the Joint Venture.

127.    Because Siemens Energy knows that the CPA with Saudi Aramco was expressly conditioned on ARPIC's participation in the Joint Venture and the construction of the JV Facility, Siemens Energy has been falsely representing to Saudi Aramco that ARPIC has been actively involved in the Joint Venture when, in fact, (i) Siemens Energy has purposely excluded ARPIC from all aspects of the Joint Venture, and (ii) Siemens Energy has been fulfilling purchase orders issued under the CPA and the other aforementioned contracts at the Siemens Facility and denying ARPIC all related benefits.

128.    In addition, Siemens Energy caused DRG entities to commence an arbitration proceeding before the ICC to hold ARPIC accountable for its capital contribution obligations, the majority of which are attributable to the JV Facility which, by virtue of Siemens Energy's covert and tortious acts, has now been abandoned.

129.    Siemens Energy then caused the DRG entities to seek enforcement of a $45 million arbitration award that represents ARPIC's share of capital contributions for the Joint Venture but does not account at all for the damages sought in this litigation, including, but not limited to (i) the significant past, present, and future profits owed to ARPIC, (ii) the value of ARPIC's ownership interest, and (iii) the substantial commissions owed to ARTC.  Not one of these critical issues was addressed or adjudicated in the

arbitration.  Nor could they have been because Siemens Energy is a stranger to the BVA and was not a party to the arbitration.

130.   Even worse, Siemens Energy continues to ignore and interfere with ARPIC's contractual rights and divert contracts and opportunities belonging to the Joint Venture even though ARPIC has fully satisfied the arbitration award and paid its share of capital contributions for the business.

### 8.    Siemens Energy Intentionally Interferes with ARTC.

131.   Under the SRA, the ASRA, and the SRA Addendum (collectively, the "Sales Agency Agreement"), the DRG entities currently owe ARTC millions of dollars in commissions and fees from, *inter alia*, (a) sales, revenues, transactions, and purchase orders involving, *inter alia*, DRG's sales of turbines and other equipment manufactured outside of Saudi Arabia, and (b) the Joint Venture's manufacturing and servicing of turbines and other equipment a within Saudi Arabia.

132.   The unpaid commissions owed to ARTC stem from sales, revenues, transactions, and purchase orders that occurred both before and after Siemens Energy's acquisition of DRG.

133.   Since the acquisition of DRG in 2015, Siemens Energy has tortiously interfered with ARTC's rights by causing DRH to breach the Sales Agency Agreements and refuse to pay the commissions owed to ARTC.

134.   Siemens Energy has also interfered with ARTC's rights under the Sales Agency Agreement by, upon information and belief, diverting sales, revenues, transactions, and purchase orders *from* the books of DRG and the Joint Venture to its own books to avoid paying commissions owed *to* ARTC under the Sales Agency

Agreements, and keeping for itself the benefits of both the sales generated by ARTC and the commissions owed to ARTC.

135.    Siemens Energy induced ARTC to forego taking any action related to the outstanding commissions by repeatedly assuring ARTC that the issue would be addressed.

136.    Indeed, as late as 2018, the parties continued to hold meetings and exchange communications at and in which Siemens Energy and/or DRG expressed their intent to pay commissions owed to ARTC.

## CAUSES OF ACTION

### FIRST COUNT
**(ARPIC's Tortious Interference Claim
Based on Diversion of Purchase Orders Issued
under the Corporate Procurement Agreement)**

137.    ARPIC re-alleges and adopts the allegations in Paragraphs 4-10, 13, 18-23, 42-109, 112-115, 122-124, and 128-130, and further alleges as follows.

138.    The BVA and BVA Amendment (collectively, the "BVA") represent valid and binding contracts between ARPIC and DRH.

139.    Pursuant to the BVA, ARPIC holds a 49.9% ownership interest in the Joint Venture and is entitled to a proportionate share of the Joint Venture's profits.

140.    The equipment manufactured and serviced pursuant to purchase orders issued under the CPA falls within the Joint Venture's Scope of Business.

141.    In fact, the Joint Venture was initially formed for the specific purpose of fulfilling all purchase orders issued under the CPA.

142.   Therefore, the purchase orders issued under the CPA are contracts belonging to the Joint Venture and ARPIC has a contractual right to its proportionate share of all benefits derived therefrom.

143.   Siemens Energy is directly and intentionally interfering with ARPIC's rights under the BVA by fulfilling purchase orders issued under the CPA outside of the Joint Venture.

144.   But for this dishonest, bad faith, and illegal interference, the purchase orders issued under the CPA would have been and/or would be fulfilled by the Joint Venture, and ARPIC would have received and/or would receive its proportionate share of the benefits from purchase orders issued under the CPA.

145.   Siemens Energy engaged in foregoing acts in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

146.   These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny ARPIC its proportionate share of the benefits from purchase orders issued under the CPA.

147.   As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

## SECOND COUNT
### (ARPIC's Tortious Interference Claim
### Based on Diversion of the Saudi Power Plant Contract)

148.    ARPIC re-alleges and adopts the allegations in Paragraphs 5-9, 11-12, 18-23, 42-49, 61-109, 112-114, 116-118, 122-124, and 128-130, and further alleges as follows.

149.    The BVA is a valid and binding contract between ARPIC and DRH.

150.    Pursuant to the BVA, ARPIC holds a 49.9% ownership interest in the Joint Venture and is entitled to a proportionate share of the Joint Venture's profits.

151.    Siemens Energy has directly and intentionally interfered with ARPIC's rights under the BVA by fulfilling the 2017 contract to manufacture and supply equipment for a heat and power plant in Saudi Arabia (the "Saudi Power Plant Contract").

152.    Some or all of the equipment provided, or to be provided, by Siemens Energy for the Saudi Power Plant falls within the Joint Venture's Scope of Business and product line.

153.    Siemens Energy could not have fulfilled some or all of the Saudi Power Plant Contract unless and until it unilaterally took control of the Joint Venture's operations, product line, and personnel.

154.   But for this dishonest, bad faith, and illegal interference, the Saudi Power Plant Contract would have been and/or would be fulfilled by the Joint Venture, and ARPIC would have received and/or would receive its proportionate share of the benefits from the Saudi Power Plant Contract.

155.   Siemens Energy fulfilled the Saudi Power Plant Contract in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

156.   These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny APRIC its proportionate share of the benefits from the Saudi Power Plant Contract.

157.   As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

### THIRD COUNT
**(ARPIC's Tortious Interference Claim
Based on Diversion of the Hawiyah Reservoir Contract)**

158.   ARPIC re-alleges and adopts the allegations in Paragraphs 5-9, 11-12, 18-23, 42-49, 61-109, 112-114, 116, 117, 119, 122-124, and 128-130, and further alleges as follows.

159.    The BVA is a valid and binding contract between ARPIC and DRH.

160.    Pursuant to the BVA, ARPIC holds a 49.9% ownership interest in the Joint Venture and is entitled to a proportionate share of the Joint Venture's profits.

161.    Siemens Energy has directly and intentionally interfered with ARPIC's rights under the BVA by entering and fulfilling a July 2020 contract with Saudi Aramco to provide compressor systems for the Hawiyah Unayzah Gas Reservoir Storage Project (the "Hawiyah Reservoir Contract").

162.    Some or all the compressor systems and other equipment provided, or to be provided, by Siemens Energy for the Hawiyah Unayzah Reservoir Storage Project fall within the Joint Venture's Scope of Business and product line.

163.    For example, the equipment provided, or to be provided, by Siemens Energy pursuant to the Hawiyah Reservoir Contract includes DRG legacy products such as DATUM centrifugal compressors and other equipment that were to be manufactured, serviced and repaired by the Joint Venture.

164.    Siemens Energy could not have fulfilled some or all of the Hawiyah Reservoir Contract unless and until it unilaterally took control of the Joint Venture's operations, product line, and personnel.

165.    But for this dishonest, bad faith, and illegal interference, the Hawiyah Reservoir Project would have been and/or would be fulfilled by the Joint Venture, and ARPIC would have received and/or would receive its proportionate share of the benefits of the Hawiyah Reservoir Contract.

166.   Siemens Energy entered and fulfilled Hawiyah Reservoir Contract in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

167.   These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny ARPIC its proportionate share of the benefits from the Hawiyah Reservoir Contract.

168.   As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

### FOURTH COUNT
**(ARPIC's Tortious Interference Claim
Based on Diversion of The Tanjib Plant Contract)**

169.   ARPIC re-alleges and adopts the allegations in Paragraphs 5-9, 11-13, 18-23, 42-49, 61-109, 112-114, 116, 117, 120, 122-124, and 128-130, and further alleges as follows.

170.   The BVA is a valid and binding contract between ARPIC and DRH.

171.   Pursuant to the BVA, ARPIC holds a 49.9% ownership interest in the Joint Venture and is entitled to a proportionate share of the Joint Venture's profits.

172.    Siemens Energy has directly and intentionally interfered with ARPIC's rights under the BVA by entering and fulfilling a February 2021 contract with Saudi Aramco to supply and service more than twenty (20) high-efficiency compressors for Saudi Aramco's Tanjib Plant facilities (the "Tanjib Plant Contract").

173.    Some or all of the high-efficiency compressor systems and other equipment provided, or to be provided, by Siemens Energy pursuant to the Tanjib Plant Contract fall within the Joint Venture's Scope of Business and product line.

174.    Siemens Energy could not have fulfilled some or all of the Tanjib Plant Contract unless and until it unilaterally took control of the Joint Venture's operations, product line, and personnel.

175.    But for this dishonest, bad faith, and illegal interference, the Tanjib Plant Contract would have been and/or would be fulfilled by the Joint Venture, and ARPIC would have received and/or would receive its proportionate share of the benefits of the Tanjib Plant Contract.

176.    Siemens Energy has entered and fulfilled the Tanjib Plant Contract in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

177.    These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny ARPIC its proportionate share of the benefits of the Tanjib Plant Contract.

178.   As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

### FIFTH COUNT
**(ARPIC's Tortious Interference Claim
Based on Diversion of the Long-Term Service Contract)**

179.   ARPIC re-alleges and adopts the allegations in Paragraphs 5-9, 11-13, 18-27, 42-49, 61-109, 112-114, 116, 117, 121-123, and 128-130, and further alleges as follows.

180.   The BVA is a valid and binding contract between ARPIC and DRH.

181.   Pursuant to the BVA, ARPIC holds a 49.9% ownership interest in the Joint Venture and is entitled to a proportionate share of the Joint Venture's profits.

182.   Siemens Energy has directly and intentionally interfered with ARPIC's rights under the BVA by entering and fulfilling a March 2021 fifteen-year long term-service contract with Saudi Aramco (the "Long-Term Service Contract"), pursuant to which Siemens Energy has become the exclusive provider and servicer of a wide range of turbines and generators for four of Saudi Aramco's major oilfields.

183.   Some or all of the turbines, generators, and other equipment provided and/or serviced, and/or to be provided and/or serviced, by Siemens Energy pursuant to the Long-Term Service Contract fall within the Joint Venture's Scope of Business.

184.    Siemens Energy could not have fulfilled some or all of the Long-Term Service Contract unless and until it unilaterally took control of the Joint Venture's operations, product line, and personnel.

185.    But for this dishonest, bad faith, and illegal conduct, the Long-Term Service Contract would have been and/or would be fulfilled by the Joint Venture, and ARPIC would have received and/or would receive its proportionate share of the benefits from the Long-Term Service Contract.

186.    Siemens Energy entered and has fulfilled and/or is fulfilling the Long-Term Service Contract in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

187.    These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny ARPIC its proportionate share of the benefits from the Long-Term Service Contract.

188.    As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

**<u>SIXTH COUNT</u>**
**(ARPIC's Tortious Interference Claim**
**Based on Diversion of Other Contracts)**

189.    ARPIC re-alleges and adopts the allegations in Paragraphs 5-9, 11-13, 18-23, 42-109, 112-124, and 128-130, and further alleges as follows.

190.    The BVA is a valid and binding contract between ARPIC and DRH.

191.    Pursuant to the BVA, ARPIC holds a 49.9% ownership interest in the Joint Venture and is entitled to a proportionate share of the Joint Venture's profits.

192.    Upon information and belief, Siemens Energy has directly and intentionally interfered with ARPIC's rights under the BVA by entering and fulfilling contracts in addition to the purchase orders issued under the CPA, the Saudi Power Plant Contract, the Hawiyah Reservoir Contract, the Tanjib Plant Contract, and the Long-Term Service Contract that fall within the Joint Venture's Scope of Business and product line.

193.    Indeed, the specific examples cited in the foregoing counts evidence the fact that, by virtue of Siemens Energy's interference with ARPIC's rights under the BVA and diverting business from the Joint Venture, Siemens Energy has become Saudi Aramco's preferred or exclusive supplier and servicer of equipment within the Joint Venture's Scope of Business.

194.    In fact, the Saudi Aramco business that Siemens Energy has diverted from the Joint Venture has become so expansive and profitable that Siemens Energy recently completed a massive expansion of the Siemens Facility so that it could fulfill those contracts.

195.    Moreover, Siemens Energy itself has admitted that at least some of the contracts identified by ARPIC based on publicly available information fall within the Joint Venture's Scope of Business.

196.    Information about other contracts diverted by Siemens Energy that fall within the Joint Venture's Scope of Business is not known to ARPIC or publicly available but rather is within the possession of Siemens Energy and its counterparties.

197.    But for this dishonest, bad faith, and illegal interference, these other contracts would have been and/or would be fulfilled by the Joint Venture, and ARPIC would have received and/or would receive its proportionate share of the benefits from them.

198.    Siemens Energy entered and has fulfilled and/or is fulfilling these contracts in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

199.    These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny ARPIC its proportionate share of the benefits from these contracts.

200.    As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

**SEVENTH COUNT**
**(ARPIC's Tortious Interference Claim**
**Arising from DRH's Breach of Non-Compete Provision)**

201. ARPIC repeats and re-alleges the allegations in Paragraphs 5-15, 18-23, 42-109, and 112-124, and further alleges as follows.

202. The BVA is a valid and binding contract between ARPIC and DRH.

203. The BVA restricts the parties' right to compete with the Joint Venture by, among other things, (i) generally prohibiting direct competition within the Scope of Business when occurring in the Scope of Local Operations, and (ii) imposing disclosure and notice requirements that are triggered when a party intends to engage in business activities in the Scope of Local Operations from which the Joint Venture could benefit or that is arguably competitive with the Joint Venture.

204. The BVA also requires the parties to "facilitate the Company's ability to purchase, service, and supports orders within the Scope of Business."

205. Siemens Energy has direct and indirect control over DRH.

206. Siemens Energy has direct knowledge of the BVA and ARPIC's rights thereunder.

207.    Siemens Energy has intentionally and tortiously interfered with those rights by using its control over DRH to cause DRH to breach the foregoing provisions of the BVA and engage or participate in and/or fulfill business contracts and opportunities that compete directly with the Joint Venture.

208.    The business contracts in which DRH is engaged and/or is fulfilling that directly compete with the Joint Venture, include but are not limited to, the purchase orders issued under the CPA, the Saudi Power Plant Contract, the Hawiyah Reservoir Contract, the Tanjib Plant Contract, and the Long-Term Service Contract.

209.    But for this fraudulent, dishonest, bad faith, and illegal interference, ARPIC would have received its proportionate share of the profits from these and other business opportunities and contracts.

210.    Siemens Energy caused DRH to breach the non-compete provisions of the BVA in bad faith, reckless disregard for the rights of ARPIC, and retaliation for ARPIC's alleged breaches of the BVA and initial failure to pay its proportionate share of capital contributions for the JV Facility and other expenses of the Joint Venture.

211.    These acts were malicious, knowing, and undertaken with the intent to injure ARPIC and deny ARPIC its proportionate share of the benefits from these and other business opportunities and contracts.

212.    As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARPIC's rights under the BVA, ARPIC has suffered, and will continue to suffer, significant harm and injury.

WHEREFORE, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

## EIGHTH COUNT
### (ARPIC's Common Law Unfair Competition Claim Based on False Misrepresentations)

213.    ARPIC re-alleges and adopts the allegations in Paragraphs 5-10, 15, 18-23, 42-109, 112-114, 126, and 127, and further alleges as follows.

214.    Unfair competition is a tort that occurs when a competitor engages in deceptive, fraudulent, unfair and unconscionable business practices that harm another. While the universe of actions that constitute unfair competition is broad, typical examples of actionable misconduct under the tort of unfair competition include, without limiting this flexible and equitable doctrine, a competitor passing itself off as being another business; stealing the contractual rights and intellectual property, pricing, and trade secrets of another; misleading or confusing the public or a consumer of goods in a manner that undermines competition; and misappropriating the goodwill of another business to capitalize on that business' name or reputation.

215.    Siemens Energy, through DRH, exercises control over the Joint Venture.

216.    Siemens Energy and ARPIC, via the Joint Venture, compete for the same pool of customers, including, but not limited to, Saudi Aramco.

217.   As set forth in the CPA and the Local Content Accord and contemplated by the BVA, Saudi Aramco agreed to have the Joint Venture fulfill purchase orders issued under the CPA based on its understanding that ARPIC holds a substantial ownership interest and has been able to actively participate in the Joint Venture's operations.

218.   Siemens Energy has stripped ARPIC of its operational and governance role in connection with the Joint Venture and has effectively excluded ARPIC from the Joint Venture.

219.   Siemens Energy, however, has falsely represented to Saudi Aramco and other customers of the Joint Venture that ARPIC has remained actively involved in the Joint Venture.

220.   By virtue of these misrepresentations, Siemens Energy has been able continue the lucrative business relationship with Saudi Aramco, divert contracts that would have been fulfilled by the Joint Venture, including, but not limited to purchase orders issued under the CPA and other contracts referenced herein, and deny ARPIC its proportionate share of the related benefits.

221.   Siemens Energy's false and deceptive representations were intentional, unfair, unconscionable, and made in bad faith.

222.   As a result of this unlawful conduct, ARPIC has suffered, and will continue to suffer, damages exclusive to it, including damages for which there is no adequate remedy at law.

**WHEREFORE**, ARPIC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) restraints enjoining Siemens Energy from

continuing to engage in the foregoing unfair and unlawful practices; (v) reasonable counsel fees and costs; and (vi) such further relief as the Court finds to be fair and just.

## NINTH COUNT
### (ARTC's Tortious Interference Claim
### Based on Failure to Pay Commissions)

223.   ARTC re-alleges and adopts the allegations in Paragraphs 1-3, 8, 18-42, 48, 64, 74, 110-111, and 131-136, and further alleges as follows.

224.   The Sales Agency Agreements represent valid and binding contracts between ARTC and DRG and its affiliates.

225.   Pursuant to the SRA and the SRA Addendum, ARTC is entitled to the payment of commissions on the sale of DRG products, including those products manufactured by the Joint Venture.

226.   Pursuant to the ASRA, ARTC is entitled to the payment of commissions on the sale of field service, repairs, and spare parts related to DRG products, including those products manufactured by the Joint Venture.

227.   Siemens Energy had knowledge of the Sales Agency Agreements, and ARTC's rights thereunder, at the time it acquired DRG and its subsidiaries.

228.   Siemens Energy has knowingly and intentionally interfered with ARTC's rights under the Sales Agency Agreements by causing the DRG and its affiliates to breach the Sales Agency Agreements and refuse to pay the commissions owed to ARTC.

229.   Siemens Energy knowingly, intentionally, and wrongfully interfered with ARTC's rights under the Sales Agency Agreements to deny ARTC millions in commissions to which ARTC is entitled.

230.   But for Siemens Energy's dishonest, bad faith, and illegal interference, ARTC would have received the commissions to which it is entitled.

231.   Siemens Energy engaged in such misconduct by using fraudulent and illegal means and in bad faith for the purpose of causing harm or injury to ARTC.

232.   As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARTC's rights under the Sales Agency Agreements, ARTC has suffered, and will continue to suffer, significant harm and injury.

**WHEREFORE**, ARTC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

**TENTH COUNT**
**(ARTC's Tortious Interference Claim**
**Based on Diversion of Business and Transactions)**

233.   ARTC re-alleges and adopts the allegations in Paragraphs 1-3, 8, 16, 18-42, 48, 64, 74, 110-111, and 131-136, and further alleges as follows.

234.   The Sales Agency Agreements represent valid and binding contracts between ARTC and DRG and its affiliates.

235.   Pursuant to the SRA and the SRA Addendum, ARTC is entitled to the payment of commissions on the sale of DRG products, including those products manufactured by the Joint Venture.

236.   Pursuant to the ASRA, ARTC is entitled to the payment of commissions on the sale of field service, repairs, and spare parts related to DRG products, including those products manufactured by the Joint Venture.

237.   Siemens Energy had knowledge of the Sales Agency Agreements, and ARTC's rights thereunder, at the time it acquired DRG and its subsidiaries.

238.   Siemens Energy has knowingly and intentionally interfered with ARTC's rights under the Sales Agency Agreements by, upon information and belief, diverting sales, revenues, transactions, and purchase orders from the books of the DRG and the Joint Venture to the books of various Siemens' subsidiaries or joints ventures to avoid paying commissions owed to ARTC under the Sales Agency Agreements.

239.   But for Siemens Energy's dishonest, bad faith, and unlawful interference, ARTC would have received the commissions to which it is entitled.

240.   Siemens Energy engaged in such misconduct by using fraudulent and illegal means and in bad faith for the purpose of causing harm or injury to ARTC.

241.   As a result of Siemens Energy's knowing, intentional, and wrongful interference with ARTC's rights under the Sales Agency Agreements, ARTC has suffered, and will continue to suffer, significant harm and injury.

**WHEREFORE**, ARTC seeks judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) punitive damages; (iii) pre-judgment interest as allowed by law; (iv) reasonable counsel fees and costs; and (v) such further relief as the Court finds to be fair and just.

<u>**ELEVENTH COUNT**</u>
**(ARTC's Unjust Enrichment Claim)**

242.   ARTC re-alleges and adopts the allegations in Paragraphs 1-3, 8, 16, 18-42, 48, 64, 74, 110-111, and 131-136, and further alleges as follows.

243.   ARTC alleges that Siemens Energy has been unjustly enriched because it and/or entities it acquired, received, and retained the benefit of the revenues from the sale of DRG products, spare parts, and related service in Saudi Arabia generated by ARTC without paying ARTC the substantial commissions owed for those sales.

244.   Permitting Siemens and/or entities it acquired to retain the benefit of the revenues from the sale of DRG products, spare parts, and related service generated by ARTC without paying ARTC the substantial commissions owed for those sales would unfairly give them the benefit of ARTC's property and efforts.

245.   Equity and good conscience forbid Siemens Energy and/or entities it acquired from retaining the benefit of ARTC's efforts and commissions without having fulfilled their contractual obligations to ARTC or without otherwise paying for the value thereof.

**WHEREFORE,** ARTC demands judgment against Siemens Energy for: (i) compensatory, special, consequential, and incidental damages; (ii) pre-judgment interest as allowed by law; (iii) reasonable counsel fees and costs; and (iv) such further relief as the Court finds to be fair and just.

<u>**DEMAND FOR JURY TRIAL**</u>

ARPIC and ARTC demand a trial by jury for all claims for which a jury trial is available as a matter of law.

Respectfully submitted,

Dated:  September 28, 2022          By:   /s/ _Ronald D. Edwards, Jr._
                                        Ronny Edwards, Jr., Esq.
                                        Florida Bar No. 0053233
                                        LOWNDES, DROSDICK, DOSTER,
                                         KANTOR & REED, P.A.

215 North Eola Drive
Post Office Box 2809
Orlando, Florida 32802
Phone: (407) 843-4600
Facsimile: (407) 843-4444
ronald.edwards@lowndes-law.com
lit.control@lowndes-law.com
tracy.kennison@lowndes-law.com

- and -

Eric T. Kanefsky, Esq.
(admitted *pro hac vice*)
Kevin J. Musiakiewicz, Esq.
(admitted *pro hac vice*)
CALCAGNI & KANEFSKY LLP
One Newark Center
1085 Raymond Blvd., 14th Fl.
Newark, New Jersey 07102
(862) 397-1796
eric@ck-litigation.com
kevin@ck-litigation.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed and served via ECF to **William V. Roppolo, Esq.**, 1111 Brickell Avenue, Suite 1700, Miami, Florida 33131 (william.roppolo@bakermckenzie.com); **Brendan D. Cook, Esq.**, 700 Louisiana Street, Suite 300, Houston, Texas 77002 (brendan.cook@bakermckenzie.com); and **Courtney Giles, Esq.**, 700 Louisiana Street, Suite 300, Houston, Texas 77002 (courtney.giles@bakermckenzie.com) this 28th day of September, 2022.

/s/ *Ronald D. Edwards, Jr.*
Ronny Edwards, Jr., Esq.